UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X   Civil Action No.: **1:22-cv-1687**

KELVIN HUNTER,

                              Plaintiff(s),      **COMPLAINT**

      -against-

DEBMAR-MERCURY LLC, IRA BERNSTEIN,
MORT MARCUS, & JOHN and JANE DOE 1-5 (Employees
of Defendant DEBMAR-MERCURY LLC, and/or
corporations/subsidiaries of DEBMAR-MERCURY LLC not
yet known)

                              Defendant(s).
------------------------------------------------------------------------X

Plaintiff KELVIN HUNTER ("Hunter"), brings this action against DEBMAR-MERCURY LLC, its employees, agents and/or servants ("hereinafter referred to as Debmar"), IRA BERNSTEIN, MORT MARCUS, and JOHN & JANE DOE 1-5, (collectively, "Defendants") alleges as follows:

## PRELIMINARY STATEMENT

1. Plaintiff brings this action against Defendants for their decision to terminate Plaintiff on the basis of his marital status which is barred by the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101, 8-107 et seq.

2. Plaintiff seeks compensatory, punitive damages, an award of costs, interest and attorney's fees, and such other and further relief as this Court deems just and proper.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over the claims asserted in this action based on diversity jurisdiction under 28 U.S.C. § 1332, in that there is complete diversity among the parties, and the amount in controversy exceeds $75,000.

4. Venue is appropriate pursuant to 28 U.S. Code § 1391(b)(2), in that the Southern District of New York, is the judicial district in which a substantial part of the events giving rise to Plaintiff's claim occurred.

5. This Court has personal jurisdiction over Defendants because Defendants conduct regular business in the State of New York.

## JURY TRIAL DEMANDED

6. Plaintiff demands a trial by jury on each and every one of his claims as pleaded herein.

## THE PARTIES

7. Plaintiff is an individual with a residence in the County of Kings in the State of New York.

8. Upon information and belief, Debmar, is a California limited liability corporation with its principal offices and principal place of business in Santa Monica, California.

9. Upon information and belief, Debmar conducts regular business in the State of New York, with offices located at 75 Rockefeller Center, 16th Floor, New York, NY 10010.

10. Upon information and belief, both Ira Bernstein and Mort Marcus, are the co-presidents and sole owners of Debmar.

11. Upon information and belief, both Ira Bernstein and Mort Marcus, are California residents.

12. Upon information and belief defendants JOHN and JANE DOE 1-5 are employees of Defendant DEBMAR-MERCURY LLC, and/or corporations/subsidiaries of DEBMAR-MERCURY LLC, not yet known.

## FACTUAL ALLEGATIONS

### A. Background

13. Ira Bernstein and Mort Marcus formed Debmar in 2004.

14. Debmar is a national television syndication company who produces, creates, finances, manages, and distributes television programming.

15. At all relevant times and, upon information and belief, continuing to date, Ira Bernstein and Mort Marcus have been handling the day-to-day affairs of Debmar.

16. In 2007, Debmar began negotiations with celebrity radio talk show host Wendy Williams (hereinafter "Williams") and her now ex-husband Plaintiff Kevin Hunter for a six-week trial of her own television talk show.

17. Plaintiff represented Williams at all times during the negotiations between Debmar and Williams. Plaintiff was used to being behind the scenes of Williams' prior ventures and used his business knowledge and street smarts to negotiate a significant financial increase from the initial contract being offered to Williams.

18. On or about July 14, 2008, Williams debuted her daytime television talk show, *The Wendy Williams Show* (hereinafter "The Show") in four cities during the summer of 2008. During the tryout, *The New York Times* remarked that the show created a "breakthrough in daytime" by introducing the genre of the "backtalk show."

19. After a successful run, *Fox* signed a distribution agreement with Debmar to broadcast the Show nationally on their stations beginning in July of 2009. In addition, *BET* picked up cable rights to broadcast the Show at night. In 2010, *BET* started airing the Show internationally in 54 countries through *BET International*. The Show attracted 2.4 million daily viewers on average, making Wendy Williams the number one female host on daytime television.

20. *The Wendy Williams Show* dominated the 10AM daily morning time slot, and to date no network has been able to beat the Show at this time slot.

21. Instrumental to the Show's success was Plaintiff Kelvin Hunter, who negotiated, produced, and planned most of the concepts and branding behind the Show.

22. At all relevant times, *The Wendy Williams Show* was filmed out of a studio in Manhattan, New York.

23. At all relevant times and, upon information and belief, continuing to date, Debmar has been directly responsible for managing, overseeing, and/or facilitating the production, syndication and distribution of *The Wendy Williams Show*, which aired on FOX TV.

24. At all relevant times, and, upon information and belief, continuing through to date, both Defendant Bernstein and Marcus has exercised substantial personal executive control over the business affairs of Debmar including, but not limited to, rendering final determinations as to the Show's staffing and/or personnel.

**B. Plaintiff Hunter's Role in *The Wendy Williams Show's* Success**

25. From on or about November of 2007, to April of 2019, Plaintiff Hunter served in the capacity of Executive Producer of *The Wendy Williams Show*.

26. As Executive Producer of the Show, Plaintiff Hunter undertook several functions that were pivotal to the Show's success, from the selection and/or final approval of the countless guests that have appeared on the Show and substantially contributed to the Show's popularity to interfacing with Bernstein and Marcus, on behalf of Wendy Williams, for purposes of developing show ideas and the day-to-day operations of the Show.

27. As Executive Producer Plaintiff Hunter was involved in:

    a)    the creation of the Show's brand and the look and feel of the Show.
    b)    helping conceptualize the wildly popular, "Hot Topics," "Shoe Cam," and "Hot Seat," segments of the Show.

4

   c) having final say for the approval or denial of the Show's proposed guest appearances.

   d) being a member of the executive team charged with hiring production staff for the Show.

   e) making sure a greater percentage of minority staff was hired to provide production services in and for the Show in order to better connect with the Show's audience.

   f) developing marketing plans and tours to boost rating in low market television areas.

   g) developing the relationship between the Show and various media outlets including major television networks, cable television networks, film and music industry talent and executives to ensure that top guests and industry leaders would be on the Show.

   h) bridging the gap between the Show and the African American community due to Debmar's lack of understanding of the Show's audience.

   i) hiring and developing security personnel and security planning for Williams.

   j) serving as an intermediary between Williams and Debmar who at times did not seem to understand Williams.

   k) developing programs to aid and stabilize Williams' personal health.

   l) maintaining Williams professional and personal well-being.

   m) planning and organizing Williams' day to day scheduling.

28. Plaintiff's Executive Producer role was accorded to Hunter pursuant to an initial November 5, 2007, contract (hereinafter "2007 contract") by and between Debmar and Wendy, Inc[1] which was renewed during the pendency of the Show's lifespan.

29. The 2007 contract not only enumerated Hunter's executive producer title but also defined Hunter's role pertaining to product integrations brought to the Show as well as other third party co-branding/marketing opportunities, not to mention compensation for all of the aforesaid services.

30. With respect to Plaintiff's role in product integrations, Hunter was to be compensated through the provision of a ten percent (10%) commission on revenues derived from

---

[1] Wendy Inc. was the corporate entity through which Plaintiff Hunter, on behalf of the Show's host Wendy Williams, did business pertaining to the Show.

those integrations as well as post-term commissions on product integrations he brought to the Show until the Product Integration Agreement either terminated or expired.

31. As a result of the Plaintiff's Hunter's years-long working relationship with and for the Defendants aforesaid Plaintiff was of the belief and understanding that he would not be terminated without lawful reasons.

### C. Unlawful Termination

32. Prior to April of 2019, Plaintiff Hunter had no reason to believe that his marriage to Host Wendy Williams would impact his business relationship with Defendants Bernstein, Marcus and Debmar, since the law prohibited same.

33. On or about April 11, 2019, Plaintiff Hunter was served with notice that his then wife, Wendy Williams, filed for divorce.

34. On or about April 18, 2019, Plaintiff Hunter received the following notice from defendant Bernstein which stated:

> *Dear Kevin:*
>
> *Out of respect for our 10-year working relationship, we had hoped to meet with you in person and traveled to New York to do so, but unfortunately, you have canceled today's meeting and we are left with no choice but to communicate to you in writing that effective immediately, your role as Executive Producer of the Wendy Williams Show is terminated, and your professional relationship with Debmar-Mercury is also concluded.*
>
> *In connection with the termination of employment, you were no longer permitted on the studio premises and all communication regarding your transition (including collection of your belongings from the studio premises) should be handled via your attorney as you have indicated that you are represented by counsel. Your attorney may reach out to either of us directly so we can direct him/her to the appropriate parties.*
>
> *Thank you for all your contributions over the years, Kevin we wish you well.*

*IRA*

35.     The message was sent from Defendant Bernstein with the tacit and/or explicit approval of Defendant Marcus on behalf of their corporation Defendant Debmar.

36.     The termination message to Plaintiff made no reference to any performance related reason(s) or any decision(s) related to Plaintiff's employment as an Executive Producer.

37.     The termination of Plaintiff was based strictly upon Plaintiff's marital status and his impending divorce to the Show's host, ignoring all of the contributions that Plaintiff made to make the Show a success.

38.     As a result of Defendants' aforesaid actions and the breach of their agreement with Hunter, the Defendants have been unjustly enriched from Plaintiff's Executive Producer contributions to the Show, as well as enduring Product Integrations engagements Plaintiff has brought to the Show and that the Show has retained.

**D.  Ending of *The Wendy Williams Show***

39.     On or about February 22, 2022, after 14 seasons, Defendants Bernstein and Marcus, on behalf of Defendant Debmar announced the ending of *The Wendy Williams Show*.

40.     Debmar co-presidents Mort Marcus and Ira Bernstein said in a statement: "Since Wendy is still not available to host the show as she continues on her road to recovery, we believe it is best for our fans, stations and advertising partners to start making this transition now. We hope to be able to work with Wendy again in the future, and continue to wish her a speedy and full recovery."

41.     The Show's slot will be taken over by Sherri Shepherd, frequent Wendy guest host.

42. According to published reports, many of the elements of *The Wendy Williams Show,* including the segments that Plaintiff helped conceptualize and the product integrations he created, will be part of Sherri Shepherd's new show.

43. Even though *The Wendy Williams Show* will be over, Defendants will continue to be unjustly enriched by Plaintiff's initial work including his initial concepts created for the Show and Plaintiff's product integration agreements.

44. The Show never recovered after Plaintiff's firing.

45. Defendants underestimated Plaintiff's value to the Show.

46. Plaintiff was an integral part of the inner workings of the Show and Debmar was unable to fill the absence of Plaintiff's departure.

47. As a result of Debmar's wrongful termination, Plaintiff has suffered an economic loss, which will be determined by trial, in the range of seven to ten million dollars.

## FIRST CAUSE OF ACTION
*Plaintiff's unlawful termination pursuant to NYCHRL § 8-107*

48. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

49. Plaintiff Hunter was employed and/or provided services for the benefit of the Defendants and thus is deemed a "covered individual" within the meaning of New York City Administrative Code § 8-101 *et. seq.* (hereinafter "New York City Human Rights Law" or "NYCHRL").

50. Defendant Debmar is an employer within the meaning of the NYCHRL.

51. The NYCHRL Administrative Code § 8-107 applies to the Defendants Debmar and its principles Defendants Bernstein and Marcus and protects Plaintiff Hunter from discrimination based on marital status.

52. In the aforementioned termination notice Defendants referred to the "...termination of your employment...", as confirmation that Plaintiff was in fact an employee.

53. Plaintiff was terminated solely because of his marital status to the Show's host, not for any performance-based reasons.

54. In fact, months before Debmar's termination of Plaintiff, Debmar tried to launch an internal investigation against Plaintiff that went nowhere and the divorce to Williams was the perfect reason to fire Plaintiff---however Defendants Marcus and Bernstein did not realize their actions were against New York City Law.

55. As a result of Defendants' unlawful and discriminatory conduct in this regard, Plaintiff Hunter has been significantly damaged reputationally, professionally, and financially.

56. Despite Hunter's valuable contributions to the Show as its Executive Producer, Defendants breached their foregoing agreements with Hunter by: (a) terminating him from his employment as Executive Producer of the Show; (b) improperly removing his credit as Executive Producer of the Show; and (c) ceasing to pay him commissions rightfully payable to him under the Product Integrations Agreement.

57. Plaintiff's divorce proceedings did not absolve the Defendants of their responsibilities to pay him for his contributions to the Show and allow him to continue in his role as Executive Producer unless agreed upon by Plaintiff Hunter and Defendants that his role would cease and that the Defendants would compensate him accordingly.

58. As a proximate result of the Defendants' actions, which were pretextual and an inappropriate breach of Hunter's employment relationship with the Defendants, Plaintiff's rights given under the New York City Human Rights Law were clearly violated because of Defendants' failure to terminate Plaintiff based on a legitimate business reason and thus did so based upon an

impermissible mixed motive of his divorce from Wendy Williams, resulting in Plaintiff Hunter being severely damaged reputationally, financially, and professionally.

59. The forgoing conduct, as alleged, constitutes a willful violation of the NYCHRL without a good or reasonable basis which constitutes a clear violation of Hunter's statutory rights to be free of employment discrimination on the basis of marital status.

60. Due to the Defendants' and/or Defendant's agents' violations of the NYCHRL, Plaintiff is entitled to recover from Defendants compensatory damages, punitive damages, lost wages, commissions, attorneys' fees, and costs and disbursements of this action.

**WHEREFORE**, Plaintiffs demand judgment as follows:

(a) On their first cause of action, a monetary award to be determined at trial, but not less than $7,000,000.00, as well as punitive damages, lost wages, commissions, entered against the Defendants jointly and severally and/or individually;

(b) For the costs and fees of this proceeding, including legal fees; and

(c) For such other and further as this Court deems just and proper.

**WHEREFORE**, Plaintiff demands judgment against the defendants individually and jointly and prays for relief as follows:

    a. For compensatory damages of not less than $7 million dollars;

    b. For punitive damages against the individual Defendants;

    c. For reasonable attorneys' fees, together with costs and disbursements;

    d. For pre-judgment interest as allowed by law; and

    e. For such other and further relief as this Court may deem just and proper.

Dated: February 28, 2022　　　　THE LAW OFFICES OF ABE GEORGE, P.C.
　　　　　New York, New York

　　　　　　　　　　　　　　　By:　　　/s/
　　　　　　　　　　　　　　　　　Abe George, Esq.
　　　　　　　　　　　　　　　　　99 Wall Street, Suite 3404
　　　　　　　　　　　　　　　　　New York, NY 10005
　　　　　　　　　　　　　　　　　(P) 212-498-9803
　　　　　　　　　　　　　　　　　(F) 646-558-7503
　　　　　　　　　　　　　　　　　e-mail: abe@abegeorge.lawyer