UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KELVIN HUNTER,

Plaintiff,

- against -

DEBMAR-MERCURY LLC, IRA
BERNSTEIN, MORT MARCUS, and
JOHN and JANE DOE 1-5 (Employees of
Defendant DEBMAR-MERCURY LLC,
and/or corporations/subsidiaries of
DEBMAR-MERCURY LLC not yet
known),

Defendants.

**MEMORANDUM
OPINION & ORDER**

22 Civ. 1687 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

In this employment discrimination action, Plaintiff Kelvin Hunter contends that

his former employer, Defendant Debmar-Mercury LLC; its principals, Defendants Ira Bernstein

and Mort Marcus; and certain Doe individuals and entities terminated his employment in

violation of the New York City Human Rights Law (the "NYCHRL"), N.Y.C. Admin. Code § 8-

101 et seq. Defendants have moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, arguing that their termination of Plaintiff is not actionable under the NYCHRL,

because the termination decision did not arise from any protected status Plaintiff enjoys under

the NYCHRL. For the reasons stated below, Defendants' motion to dismiss will be denied.

## BACKGROUND

Plaintiff alleges that he is a citizen of New York and that Debmar-Mercury is an

LLC, the sole members of which are Defendants Bernstein and Marcus. Bernstein and Marcus

are, in turn, citizens of California. (Aug. 7, 2023 Pltf. Ltr. (Dkt. No. 39); see Cmplt. (Dkt. No. 1)

¶¶ 7-11)  Jurisdiction is premised on diversity of citizenship, pursuant to 28 U.S.C. § 1332.
(Cmplt. (Dkt. No. 1) ¶ 3)

I.      **FACTS**[1]

        Plaintiff Hunter is the ex-husband of Wendy Williams, the host of the <u>Wendy
Williams Show</u>, a daytime television program that ran from 2008 to 2022.  Hunter was the
executive producer of the <u>Wendy Williams Show</u> from its inception until his termination in April
2019.  "As Executive Producer of the Show, Plaintiff Hunter undertook several functions that
were pivotal to the Show's success, from the selection and/or final approval of the countless
guests [who] have appeared on the Show and substantially contributed to the Show's popularity,
to interfacing with Bernstein and Marcus [–] on behalf of Wendy Williams [–] for purposes of
developing show ideas and the day-to-day operations of the Show."  (<u>Id.</u> ¶¶ 16, 18, 25-26, 28, 32
39)

        "Debmar[-Mercury] is a national television syndication company [that] produces,
creates, finances, manages, and distributes television programming."  Defendants Bernstein and
Marcus are Debmar-Mercury's "co-presidents" and "handl[e] [its] day-to-day affairs."  Debmar-
Mercury produced the <u>Wendy Williams Show</u> for the entirety of its run, and "Bernstein and
Marcus . . . exercised substantial personal executive control over the business affairs of
Debmar[-Mercury,] including, but not limited to, rendering final determinations as to the Show's
staffing and/or personnel."  (<u>Id.</u> ¶¶ 10, 14-16, 24, 39)

        On or about April 11, 2019, Plaintiff Hunter was served with notice that his then-
        wife, Wendy Williams, [had] filed for divorce.

---

[1]  The Court's factual account is drawn from the Second Amended Complaint ("SAC").  The
SAC's factual allegations are presumed true for purposes of resolving Defendants' motion to
dismiss.  <u>See</u> <u>Kassner v. 2nd Ave. Delicatessen, Inc.</u>, 496 F.3d 229, 237 (2d Cir. 2007).

On or about April 18, 2019, Plaintiff Hunter received the following notice from
defendant Bernstein, which stated:

> Dear Kevin:
>
> Out of respect for our 10-year working relationship, we had hoped to meet
> with you in person and traveled to New York to do so, but unfortunately,
> you have canceled today's meeting and we are left with no choice but to
> communicate to you in writing that effective immediately, your role as
> Executive Producer of the <u>Wendy Williams Show</u> is terminated, and your
> professional relationship with Debmar-Mercury is also concluded.
>
> In connection with the termination of employment, you [are] no longer
> permitted on the studio premises, and all communication regarding your
> transition (including collection of your belongings from the studio
> premises) should be handled via your attorney, as you have indicated that
> you are represented by counsel.  Your attorney may reach out to either of
> us directly so we can direct him/her to the appropriate parties.
>
> Thank you for all your contributions over the years, Kevin we wish you
> well.
>
> - Ira

The message was sent from Defendant Bernstein with the tacit and/or explicit
approval of Defendant Marcus on behalf of their corporation, Defendant
Debmar[-Mercury].

The termination message to Plaintiff made no reference to any performance-
related reason(s) or any decision(s) related to Plaintiff's employment as an
Executive Producer.

(<u>Id.</u> ¶¶ 33-36)[2]

## II.     **PROCEDURAL HISTORY**

The Complaint was filed on March 1, 2022 (Dkt. No. 1), and asserts a claim for

"unlawful termination pursuant to NYCHRL § 8-107."  Plaintiff contends that he "was

---

[2]  Although Plaintiff uses the first name "Kelvin" in the caption of the Complaint, it appears from
this April 18, 2019 notice and other materials that he also uses the name "Kevin."  <u>See, e.g.,</u>
David Marchese, <u>Talk:  Wendy Williams Wants to Be the Realest in the Game</u>, N.Y. Times
Magazine (Aug. 26, 2019) (Wendy Williams referring to Plaintiff as "Kevin" in an interview),
<u>available</u> <u>at</u> https://nyti.ms/3eg3Y2O.

terminated solely because of his marital status [vis-à-vis] the Show's host," and that this "conduct . . . constitutes a clear violation of Hunter's statutory rights [under the NYCHRL] to be free of employment discrimination on the basis of marital status." (Id. ¶¶ 48-60)

In a June 6, 2022 letter, Defendants sought permission to move to dismiss the Complaint for failure to state a claim. Defendants contend that

> "[t]he New York Court of Appeals has held that the prohibitions against marital status discrimination under [the New York State Human Rights Law] and [NYCHRL] prohibit discrimination only on the basis of marital status, i.e. discrimination based on the mere fact that a person is married or unmarried." Courts in the Second Circuit have adopted that same construction. Under the NYCHRL, "marital status discrimination is limited to discrimination against those who are married or unmarried and does not apply to discrimination based on being married <u>to a particular person</u>."

(June 6, 2022 Def. Ltr. (Dkt. No. 17) at 2-3[3] (quoting <u>Christoforou v. Cadman Plaza N., Inc.</u>, No. 04-CV-08403 (KMW), 2009 WL 723003, at *7, n.8 (S.D.N.Y. Mar. 19, 2009), and <u>Gokhberg v. PNC Bank, N.A.</u>, No. 17-CV-00276 (DLI)(VMS), 2021 WL 421993, at *15-16 (E.D.N.Y. Jan. 6, 2021)) (brackets and emphasis in Defendants' letter))

At a July 28, 2022 conference concerning Defendants' proposed motion to dismiss, this Court pointed out that Defendants' construction of the NYCHRL had been rejected in <u>Morse v. Fidessa Corp.</u>, 165 A.D.3d 61 (1st Dept. 2018), in which the First Department held that "the [NYCHRL's] prohibition of marital status [discrimination] addresses not only 'whether an individual is married or not married,' but also 'whether two individuals are married to each other or not married to each other.'" (July 28, 2022 Tr. (Dkt. No. 29) at 8 (quoting <u>Morse</u>, 165 A.D.3d at 68)). This Court further noted that in reaching this holding, the <u>Morse</u> court had concluded that <u>Levin v. Yeshiva Univ.</u>, 96 N.Y.2d 484 (2001) had been abrogated by an

---

[3]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

amendment to the NYCHRL.  (July 28, 2022 Tr. (Dkt. No. 29) at 8; see Morse, 165 A.D.3d at 67-68 (discussing Levin).  In Levin, the New York Court of Appeals held that "for purposes of applying the [NYCHRL's] statutory proscription against marital status discrimination, a distinction must be made between the complainant's marital status as such, and the existence of the complainant's disqualifying relationship – or absence thereof – with another person."  Levin, 96 N.Y.2d at 490.  The Levin court had ruled that the latter circumstance is not covered by the NYCHRL.

At the July 28, 2022 conference, this Court explained that

> [P]laintiff's New York City Human Rights Law discrimination claim rises out of his divorce from Williams.  Under Morse, such a theory of marital status discrimination is now cognizable.
>
> Defendants have not addressed Morse or its progeny in their pre-motion letter. Defendants instead cite to Gokhberg v. PNC Bank, Nat'l Assn, 2021 WL 421993 (E.D.N.Y. Jan. 6, 2021), which states that "marital status discrimination is limited to discrimination against those who are married or unmarried, and does not apply to discrimination based on being married to a particular person."  Id. at *6. Gokhberg, in turn, relies on Christoforou v. Cadman Plaza N., Inc., 2009 WL 723003 at *7, n.8, (S.D.N.Y. Mar. 19, 2009), which in turn relies on the New York Court of Appeals decision in Levin.  Id.  For reasons the Morse Court explains, Levin is no longer good law.
>
> Because it appears that [P]laintiff has pled a valid theory of marital status discrimination under the New York City Human Rights Law, [D]efendants' proposed motion to dismiss appears unlikely to succeed.

(July 28, 2022 Tr. (Dkt. No. 29) at 9)

At the conclusion of the July 28, 2022 conference, the Court "ask[ed] defense counsel to speak with the clients about what [it had] said . . . and to submit a letter in one week's time stating whether they wish to proceed with the proposed motion to dismiss.  If so, defense counsel will explain why there is a good-faith basis for doing so in light of the case law . . . discussed today."  (Id. at 12)

In an August 4, 2022 letter, Defendants state that they will proceed with their motion to dismiss, because "this Court is not bound by <u>Morse</u> to the extent that it does not persuasively state New York law." (Dkt. No. 27 at 1)  This Court subsequently issued a briefing schedule for Defendants' motion.  (Aug. 8, 2022 Order (Dkt. No. 28))

Defendants filed their motion to dismiss on October 21, 2022.  (Dkt. No. 31)

## DISCUSSION

## I.   LEGAL STANDARDS

### A.   Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," <u>Kassner</u>, 496 F.3d at 237 (2d Cir. 2007) (citing <u>Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals</u>, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  <u>Id.</u> (citing <u>Fernandez v. Chertoff</u>, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests."  <u>Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.</u>, 507 F.3d 117, 121 (2d Cir. 2007) (citing <u>Twombly</u>, 550 U.S. at 555).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice [to establish entitlement to relief]."  <u>Iqbal</u>, 556 U.S. at 678.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)).  Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)).

### B.      NYCHRL Employment Discrimination Claims

The NYCHRL provides that

[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status of any person:

> (1) [t]o represent that any employment or position is not available when in fact it is available;
>
> (2) [t]o refuse to hire or employ or to bar or to discharge from employment such person; or
>
> (3) [t]o discriminate against such person in compensation or in terms, conditions or privileges of employment.

N.Y.C. Admin. Code § 8-107(1)(a).  "Marital status" is not defined in the NYCHRL.

As to statutory construction, the NYCHRL provides that

[t]he provisions of this title shall be construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed.

> Exceptions to and exemptions from the provisions of this title shall be construed narrowly in order to maximize deterrence of discriminatory conduct.
>
> Cases that have correctly understood and analyzed the liberal construction requirement of subdivision a of this section and that have developed legal doctrines accordingly that reflect the broad and remedial purposes of this title include Albunio v. City of New York, 16 N.Y.3d 472 (2011), Bennett v. Health Management Systems, Inc., 92 A.D.3d 29 (1st Dep't 2011), and the majority opinion in Williams v. New York City Housing Authority, 61 A.D.3d 62 (1st Dep't 2009).

Id. § 8-130 (paragraph lettering omitted).

The New York City Council has instructed that "similarly worded provisions of federal and state civil rights laws [are] a floor below which the City's Human Rights law cannot fall, rather than a ceiling above which the local law cannot rise." N.Y.C. Local Law 85 (the "Restoration Act") § 1 (2005); see also Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013) (instructing district courts to "constru[e] the NYCHRL's provisions 'broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible'") (quoting Albunio, 16 N.Y.3d at 477-78). "But any such broad construction must be reasonable and grounded in the language of the [statute]." Doe v. Bloomberg, L.P., 36 N.Y.3d 450, 462 (2021) (emphasis in original).

## II.    ANALYSIS

Defendants do not dispute that if the definition of "marital status" in the NYCHRL includes an employee's marital status in relation to another person, Hunter has stated a claim. Accordingly, the sole issue on this motion is whether such a claim is cognizable under the NYCHRL.

A.      **Applicable Law**

1.      ***Morse v. Fidessa Corp.*, 165 A.D.3d 61 (1st Dept. 2018)**

In <u>Morse</u>, plaintiff was employed at a financial services company, and alleged that

he was fired after his "perceived" spouse – a co-worker – left for a rival firm.  Morse "was told

that he was fired because of this perceived marital relationship, and that, if he divorced [his

perceived spouse], he would be reconsidered for re-employment." <u>Morse</u>, 165 A.D.3d at 62-63.

"Defendants moved to dismiss the complaint on the ground that the [NYCHRL's] protection

[does] not extend to employment decisions based on the identity of the employee's partner or

spouse, but only on the basis of whether he or she was married or not." <u>Id.</u> at 63.  Supreme

Court, New York County, denied the motion to dismiss, and the First Department affirmed.

The <u>Morse</u> court first describes the pre-Restoration Act case law on this point, as

set out by the New York Court of Appeals in <u>Levin v. Yeshiva University</u>, 96 N.Y.2d 484

(2001):

> Before the passage of the Local Civil Rights Restoration Act of 2005, N.Y.C.
> Local Law 85 (2005) (the "Restoration Act"), the Court of Appeals had resolved
> the above-stated question – without recourse to liberal construction analysis – by
> holding that "a distinction must be made between the complainant's marital status
> as such, and the existence of the complainant's disqualifying relationship – or
> absence thereof – with another person." <u>Levin</u>, 96 N.Y.2d at 490.  In <u>Levin</u>, [a
> housing discrimination case,] the "disqualifying relationship" was one that was
> not a "legally recognized, family relationship[]." <u>Id.</u> at 490-491.  Thus, if a
> housing provider refused to rent to an unmarried person, <u>regardless of whether the
> unmarried person was living with another person</u>, its conduct would be
> actionable.  However, if the housing provider treated an unmarried <u>couple</u>
> disadvantageously, that would not be actionable because the disadvantageous
> treatment would not be based on the couple's marital status but on the
> disqualifying relationship (not being a "legally recognized, family
> relationship[]").
>
> <u>Levin</u>'s holding was derived from <u>Matter of Manhattan Pizza Hut v. New York
> State Human Rights Appeal Bd.</u>, 51 N.Y.2d 506 (1980), an employment
> discrimination case brought under the New York State Human Rights Law, not
> the [NYCHRL].  <u>Manhattan Pizza Hut</u> ruled that the "plain and ordinary meaning
> of 'marital status' is the social condition enjoyed by an individual by reason of his

> or her having participated or failed to participate in a marriage." 51 N.Y.2d at 511. That is, "when one is queried about one's 'marital status,' the usual and complete answer would be expected to be a choice among 'married,' 'single,' etc., but would not be expected to include an identification of one's present or former spouse and certainly not the spouse's occupation." Id. at 511-12.

Id. at 64 (citation formatting altered; emphasis in original).

The Morse court then explains that the Restoration Act and subsequent City Council legislation passed in 2016 require courts to alter their construction of the NYCHRL:

> The Restoration Act changed the judicial landscape with respect to the [NYCHRL]. A more recent enactment, N.Y.C. Local Law 35 (2016), went even further. That law amended Administrative Code § 8-130 ("Construction") "to provide additional guidance for the development of an independent body of jurisprudence for the New York city human rights law that is maximally protective of civil rights in all circumstances." Local Law 35 § 1.
>
> In the March 8, 2016 report of the Committee on Civil Rights that accompanied Local Law 35 (the Committee Report), the Council set forth its concerns:
>
>> Over at least the last 25 years, the Council has sought to protect the [NYCHRL] from being narrowly construed by courts, particularly through major legislation adopted in 1991 and 2005. These actions have expressed a very specific vision: a Human Rights Law designed as a law enforcement tool with no tolerance for discrimination in public life. The 2005 Restoration Act provided that the [NYCHRL] is to be interpreted liberally and independently of similar federal and state provisions to fulfill the "uniquely broad and remedial" purposes of the law. The Act amended the [NYCHRL's] liberal construction provision, Administrative Code § 8-130, to accomplish this goal. Some courts have recognized and followed this vision, but others have not, and many areas of the law remain as they were before the 2005 Restoration Act because they have not been scrutinized to determine whether they are consistent with the uniquely broad requirements of the [NYCHRL].
>
> Comm. Rept. of the Govt. Affairs Div., Comm. on Civ. Rights at 8 (Mar. 8, 2016) (emphasis added).
>
> The amendment included ratification of three decisions under the [NYCHRL]: Albunio v. City of New York, 16 N.Y.3d 472 (2011); Bennett v. Health Mgt. Sys., 92 A.D.3d 29 (1st Dept. 2011); and Williams v. N.Y.C. Housing Auth., 61 A.D.3d 62 (1st Dept 2009). See N.Y.C. Admin. Code § 8-130(c). Each of the cases was described as having "correctly understood and analyzed the liberal construction requirement" of the [NYCHRL], and as having "developed legal doctrines accordingly that reflect the broad and remedial purposes" of the

10

> [NYCHRL].  Id.  To ignore or deviate from any of the Committee Report cases would be to flout the Council's intent as to the [NYCHRL].
>
> . . . .
>
> Thus, [pursuant to the Restoration Act and Local Law 35,] courts must play a highly active role in the development of the [NYCHRL] by interpreting all cases in a manner consistent with the goal of providing unparalleled strength in deterring and remedying discrimination.  As the Court of Appeals ruled in Albunio, 16 N.Y.3d 472, one of the Committee Report cases, all the provisions of the [NYCHRL] must be construed "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible."  16 NY3d at 477-78.

Id. at 64-65, 67 (footnote omitted; citation formatting altered; emphases in Morse).

The Morse court goes on to conclude that the Restoration Act and Local Law 35 abrogate Levin:

> Our task in construing the term "marital status" is guided by the above-stated history.  Levin . . . relied in part on an interpretation of the New York State Human Rights Law and failed to engage in liberal construction analysis, let alone the enhanced liberal construction analysis intended by the comprehensive 1991 amendments to the [NYCHRL], N.Y.C. Local Law 39 (1991) (which were only brought to life in 2005, with the passage of the Restoration Act).  Thus, Levin's interpretation of "marital status" cannot be sustained.
>
> Indeed, Levin was cited in connection with the passage of the Restoration Act as illustrative of the cases that had "'either failed to interpret the City Human Rights Law to fulfill its uniquely broad purposes, ignore[d] the text of specific provisions of the law, or both.'"  Williams, 61 A.D.3d at 67 (quoting from transcript of Council debate).  With the passage of the Restoration Act, Levin "'and others like it will no longer hinder the vindication of our civil rights.'"  Id. (quoting from debate transcript).
>
> Plainly, the Council rejected the "plain and ordinary" meaning of "marital status" as set forth in Manhattan Pizza Hut, and consequently the distinction between marital status as such and marital status as a "disqualifying relationship."
>
> "Marital status" may refer to whether an individual is married or not married.  It may also refer to whether two individuals are married to each other or not married to each other.  In the instant case, it refers to the latter:  the marital status of two people in relation to each other.

Id. at 67-68 (citation formatting altered; internal alterations of quotations omitted).

The <u>Morse</u> court likewise rejects defendants' reliance on (1) <u>Cerullo v. Fricione</u>, 2010 NY OATH LEXIS 428 (June 2, 2010), a 2010 administrative law judge ("ALJ") decision holding that "actionable marital status discrimination [under the NYCHRL] is based on the status of an individual as married, single, separated, divorced, or widowed, not on the status of an employee in relation to another employee," <u>Cerullo</u>, 2010 NY OATH LEXIS 428, *17; and (2) "Intro 22," a 2004 draft of the Restoration Act that, unlike the version of the Act that was enacted, defines "marital status" as "the marital status of a person in isolation, [and/or] the marital status of a person in relation to another person," N.Y. City Council, Comm. on Gen. Welfare, Int. No. 22 ("Intro 22") § 2 (Sept. 22, 2004) (<u>available</u> <u>at</u> Dkt. No. 33-2):

> Defendants' reliance on the decision of [a] New York City Commission on Human Rights [ALJ] in [Cerullo], a pretrial decision dismissing marital status claims . . . is misplaced for a variety of reasons.
>
> As a preliminary matter, the ALJ decision is not entitled to deference by courts. "[W]here the question is one of pure statutory reading and analysis, . . . there is little basis to rely on any special competence or expertise of the administrative agency," and "courts are free to ascertain the proper interpretation from the statutory language and legislative intent." <u>Matter of Smith v. Donovan</u>, 61 A.D.3d 505, 508-509 (1st Dept. 2009) (internal quotation marks omitted).
>
> . . . .
>
> To the extent that <u>Cerullo</u> is premised on . . . [Intro 22,] an early version of the Restoration Act . . ., it proceeds on faulty assumptions. . . .
>
> What <u>Cerullo</u> fails to note is that the Council explicitly chose another path for changing the definition of marital status. That is, it accepted the proposition that "[i]n respect to marital status, the addition of 'partnership status' [to § 8-107's list of prohibited bases for employment discrimination] is only an interim measure; the broader question will have to be revisited after the courts have re-examined their previous marital status rulings in light of each and all of the requirements of revised Section 8-130." [Testimony of Craig Gurian, bill author and director of the Anti-Discrimination Center of Metro N.Y., at 7 (Apr. 14, 2005), <u>available</u> <u>at</u> http://www.nycourts.gov/reporter/webdocs/CenterTestimony041405.pdf]. . . . Confirmation that the Council left the interpretation of "marital status" to the courts is found in the report of the Committee on General Welfare, which stated [that] "[p]ending judicial reconsideration of the proper scope of protection from discrimination based on marital status, this provision [partnership status] will

ensure that" domestic partners are protected "from all forms of discrimination addressed by the human rights law."  Rept. of Govt. Affairs Div., Comm. on Gen. Welfare, Aug. 17, 2005, 2005 N.Y. City Legis. Ann. at 536.

The reasons the Council did not add a marital status provision in 2005 are open to speculation. . . .

What there cannot be speculation about is these facts:  (a) the Council, in leaving the parameters of "marital status" to the courts, could have narrowed the courts' mandate in one or more ways but did not; (b) the overall mandate to construe the [NYCHRL] to achieve its uniquely broad purposes was put in place for all issues, as reaffirmed by Local Law 35; (c) the liberal construction provision was envisioned as "obviating the need for wholesale textual revision of the myriad specific substantive provisions of the law," Williams, 61 A.D.3d at 74; (d) the narrow definition in Levin of marital status for [NYCHRL] purposes was legislatively overruled; (e) providing [NYCHRL] protection for couples on the basis of whether or not they are married to one another involves an entirely plausible interpretation of "marital status"; and (f) encompassing "couples' protection" within the proscription against discrimination on the basis of marital status is the best way to achieve broad coverage of the city law in accordance with the stated goal of the Council to meld the broadest vision of social justice with the strongest law enforcement deterrent.

Morse, 165 A.D.3d at 70-72 (further citations omitted; citation formatting altered; emphasis in original).

Morse has been followed by at least one New York court.  See Karayiorgou v. The Trustees of Columbia University, 2021 WL 143472, at *4-5 (Sup. Ct. N.Y. Cnty., Jan. 14, 2021) ("Plaintiff has shown that she was qualified as a leading researcher and scientist to join the Zuckerman Institute, that an offer to join the Zuckerman Institute was made to her and that her offer was rescinded in March 2015 only after Colombia learned that plaintiff and [her scientist husband] divorced in December 2014. . . . Under . . . Morse . . . , a jury could find that defendants' actions were motivated by plaintiff's marital status.").  The parties have cited no case that has rejected Morse's analysis, nor is this Court aware of any such case.

13

2.      *Erie* **and Intermediate State Court Appellate Decisions**

Pursuant to Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), a federal court

exercising diversity jurisdiction must apply the substantive state law that would govern had the

case been brought in state court.

> [I]n applying the law of a given state, the pronouncement of the state's highest
> court "is to be accepted by federal courts as defining state law." West v. Am. Tel.
> & Tel. Co., 311 U.S. 223, 236 (1940). "Where the high court has not spoken, the
> best indicators of how it would decide are often the decisions of lower state
> courts." In re Brooklyn Navy Yard Asbestos Litig., 971 F.2d 831, 850 (2d Cir.
> 1992). To be sure, a federal court is not bound by the opinions of a state's lower
> courts. But the decision of an "intermediate appellate state court" is "datum for
> ascertaining state law which is not to be disregarded by a federal court unless it is
> convinced by other persuasive data that the highest court of the state would decide
> otherwise." West, 311 U.S. at 237. When faced with an unsettled question of
> state statutory interpretation, a federal court should consider "the statutory
> language, pertinent legislative history, the statutory scheme set in historical
> context, how the statute can be woven into the state law with the least distortion
> of the total fabric, state decisional law, and federal cases which construe the state
> statute." Bensmiller v. E.I. Dupont de Nemours & Co., 47 F.3d 79, 82 (2d Cir.
> 1995).

In re Gen. Motors LLC Ignition Switch Litig., 407 F. Supp. 3d 212, 220 (S.D.N.Y. 2019) (further

citations omitted).

Accordingly, while a federal court applying state law is not bound by the rulings

of intermediate appellate state courts, it is generally not free to entirely disregard such rulings.

Indeed, in the absence of persuasive evidence that a state's highest court would rule to the

contrary, the decisions of an intermediate appellate state court should be followed. Id.

Mayes v. Summit Ent. Corp. ("Mayes II"), 287 F. Supp. 3d 200 (E.D.N.Y. 2018),

is instructive on this point. In that case, models sued strip club operators for wrongfully using

their likenesses. Plaintiffs contended, inter alia, that defendants' conduct violated New York's

Deceptive Trade Practices Act, N.Y. Gen. Bus. Law § 349. Defendants moved to dismiss, citing

DePinto v. Ashley Scott, Inc., 222 A.D.2d 288 (1st Dept. 1995), in which the First Department

held – without analysis – that a non-consumer plaintiff in a GBL § 349 case – such as the models in <u>Mayes</u> – must allege not only customer confusion, but also "a significant risk of harm to the public health or interest." <u>DePinto</u>, 222 A.D.2d at 289.

A magistrate judge issued a Report & Recommendation ("R&R") recommending that the motion to dismiss be denied, finding that <u>DePinto</u> was not persuasive because it relied on "summar[y] [reasoning]" and "rest[s] on . . . flawed foundations." <u>Mayes v. Summit Ent. Corp.</u> ("<u>Mayes I</u>"), No. 116CV06533NGGST, 2018 WL 566314, at *13 (E.D.N.Y. Jan. 18, 2018).

The district court rejected the magistrate judge's recommendation:

> Even though the R & R is correct that the Court of Appeals has not ruled on the matter, it errs in its belief that this court does not have to follow what the Appellate Division says. . . . "The Appellate Division's statements concerning state law are persuasive evidence of the views of New York's intermediate appellate courts on the matter," and . . . courts cannot ignore decisions by the Appellate Division whether or not such decisions have "articulated a reasoned basis." [<u>DiBella v. Hopkins,</u> 403 F.3d 102, 113 (2d Cir. 2005)]. . . . [T]his court is "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." <u>Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC</u>, No. 14-CV-3020 (KBF), 2018 WL 357315, at *3 (S.D.N.Y. Jan. 10, 2018). A federal court may not choose to ignore substantive state law if there is no indication that state courts have abandoned their precedent on the matter.

<u>Mayes II</u>, 287 F. Supp. 3d at 206-07 (further citations omitted; internal alterations omitted); <u>see also</u> <u>id.</u> at 207 n.2 (listing cases applying the "persuasive evidence" standard). The district court went on to find that plaintiff had not alleged "a significant risk of harm to the public health or interest" as required by <u>DePinto</u>, and therefore granted defendants' motion to dismiss plaintiffs' GBL § 349 claim. <u>Id.</u> at 210-11.

**B.**     **<u>Whether <i>Morse</i>'s Definition of "Marital Status" Should Be Followed</u>**

Defendants contend that <u>Morse</u>'s holding – that "'[m]arital status' [– as used in the NYCHRL –] may refer to . . . whether two individuals are married to each other or not

married to each other," <u>Morse</u>, 165 A.D.3d at 68 – "cannot be accepted as an accurate statement

of the NYCHRL and should not control the disposition of Plaintiff's case." (Def. Br. (Dkt. No.

32) at 15)  As discussed above, in asking this Court to disregard <u>Morse</u>, Defendants must present

"persuasive evidence" demonstrating that the New York Court of Appeals would reach a

different result. <u>Mayes II</u>, 287 F. Supp. 3d at 206-07; <u>see</u> <u>West</u>, 311 U.S. at 237.

      In support of their motion to dismiss, Defendants first argue that courts in this

District "not uncommon[ly]" reject the decisions of the Appellate Division.  Defendants then

argue that <u>Morse</u> is not persuasive because (1) it "disregard[s] the legislative history that

contradicts its construction of 'marital status'"; (2) "the liberal construction provision of the

NYCHRL does not justify judicially changing the definition of 'mar[it]al status'"; and (3)

"construing the definition of 'marital status' to include marriage to a specific person would

undermine anti-nepotism policies." (Def. Br. (Dkt. No. 32) at 15-22 (capitalization altered); <u>see</u>

<u>also</u> <u>id.</u> at 10-14 (discussing legislative history of the Restoration Act))

      These arguments do not amount to "persuasive evidence" that the New York

Court of Appeals would reject <u>Morse</u>.

### 1.    <u>Rejection of Appellate Division Decisions</u>

      Citing <u>Brentwood Pain & Rehabilitation Services, P.C. v. Allstate Insurance Co.</u>,

508 F. Supp. 2d 278, 293-94 (S.D.N.Y. 2007), and <u>U.S. Specialty Insurance Co. v. Wesco Ins.

Co.</u>, 529 F. Supp. 3d 251, 258–59 (S.D.N.Y. 2021), Defendants contend that "it is not

uncommon for courts of this district to decline to follow [Appellate Division] decisions." (Id. at

15)  Neither case supports that proposition, however.

      In <u>Brentwood</u>, the parties disputed whether a New York insurance regulation

regarding reimbursement, which did not explicitly mention MRIs, nevertheless applied to MRIs.

The New York State Department of Insurance had issued opinion letters stating that the

regulation applied to MRIs, and the Brentwood court adopted that view.  508 F. Supp. 2d at 290-92.  In so holding, the court declined to follow (1) a Queens County Civil Court decision holding that the regulation did not apply to MRIs; and (2) a Third Department decision holding that a similarly worded regulation did not refer to sonograms, because it did not explicitly refer to sonograms.  The Brentwood court explained that these cases were distinguishable, because the opinion letters were not before the Civil Court, and the Third Department decision involved sonograms and not MRIs.  Id. at 293-94.

As to U.S. Specialty Insurance, Defendants assert that that court "did 'not find [intermediary] cases persuasive' in order to predict how the [New York] Court of Appeals would rule on the question presented."  (Def. Br. (Dkt. No. 32) at 15 (quoting U.S. Specialty Ins., 529 F. Supp. 3d at 258-59) (bracketed material added in Def. Br.))  But the cases that the U.S. Specialty Insurance court finds unpersuasive are from Federal district courts sitting in diversity, and not from intermediate appellate state courts.  See U.S. Specialty Ins., 529 F. Supp. 3d at 259 ("[T]he Court may also consider the district court cases Colony cites [ – Mt. Hawley Insurance Co. v. Liberato, 2010 WL 2653326 (E.D.N.Y. June 25, 2010), and Mt. Hawley Insurance Co. v. National Builders LLC, 2009 WL 1919611 (S.D.N.Y. June 25, 2009) – ] in its effort to predict how the New York Court of Appeals would resolve the questions at bar.  However, the Court does not find those cases persuasive in this context.") (quotation omitted).  Indeed, the U.S. Specialty Insurance court applies an Appellate Division case instead of those district court cases. Id. at 258-59 (citing and applying 233 E. 17th St., LLC v. L.G.B. Dev., Inc., 78 A.D.3d 930 (2d Dept. 2010)).

In sum, <u>Brentwood</u> and <u>U.S. Specialty Insurance</u> provide no support for Defendants' argument that courts in this District exercising diversity jurisdiction frequently reject Appellate Division holdings regarding New York law.

### 2.    <u>Legislative History</u>

Defendants note that Intro 22 – the 2004 draft of the Restoration Act – and a 2003 predecessor bill for the Restoration Act both include the following language: "'The term "marital status" refers both to the marital status of a person in isolation, <u>and to the marital status of a person in relation to another person.</u>'" (Def. Br. (Dkt. No. 32) at 10 (quoting N.Y. City Council, Comm. on Gen. Welfare, Int. No. 439 (Apr. 30, 2003) (emphasis in Def. Br.); and citing Intro 22 (same)) The language regarding "in relation to another person" does not appear in the Restoration Act.

Defendants go on to argue that

> [t]his twice-proposed amendment, if adopted, would have expanded the scope of marital status protection to include "the marital status of a person in relation to another person." But as the legislative history demonstrates, when the NYC Council ultimately adopted the Act in 2005, the NYC Council did <u>not</u> enact this amendment precisely because it did not intend this outcome.

> . . . .

> Although <u>Morse</u> elliptically cites to testimony heard by the NYC Council before the passage of the Act, the decision <u>nowhere</u> acknowledges even the existence of the 2003 and 2004 proposed amendments to the definition of "marital status." <u>See</u> 165 A.D.3d at 67-70. This omission is remarkable, considering that those two proposed amendments would have enacted the exact expanded definition that the <u>Morse</u> decision endorsed – the status of "two people <u>in relation to each other.</u>" <u>Id.</u> at 68 (emphasis added).

> Thus, <u>Morse</u> ignores the history of the NYC Council which twice considered and twice rejected that same expanded definition. The U.S. Supreme Court's admonition, in another case of statutory interpretation that followed a legislative amendment, is especially instructive: "to adopt [such an] interpretation would read back into the [relevant] Act the very word [] that the [legislative body] deleted. We ordinarily will not assume that [the legislature] intended to enact statutory language that it has <u>earlier discarded in favor of other language.</u>"

Chickasaw Nation v. United States, 534 U.S. 84, 93 (2001) (emphasis added;
internal quotation marks and citation omitted).

(Def. Br. (Dkt. No. 32) at 11, 16-17 (alterations in Def. Br.; further citations omitted); see also

Def. Reply Br. (Dkt. No. 34) at 7 (citing People v. Korkala, 99 A.D.2d 161 (1st Dept. 1984), and

Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers, 414 U.S. 453 (1974)))

   Defendants further contend that the City Council's reason for not enacting Intro

22's proposed definition of "marital status" can be discerned from the 2003 and 2004 hearing

testimony of (1) Clifford Mulqueen, then-Deputy Commissioner for the New York City

Commission on Human Rights; and (2) then-Commissioner Patricia Gatling.  Mulqueen and

Gatling testified that "'[t]he [C]ommission [on Human Rights] feels that this definition would be

inappropriate since it does not relate to the definition of marital status or any other protected

class but rather extends the law to protect based upon personality traits, individual qualities or

characteristics. . . . The proposed definition of marital status will have the unintended

consequence of protecting individuals who are not involved in the type of relationships that the

. . . the City Council is seeking to protect.'"  (Def. Br. (Dkt. No. 32) at 11-12 (quoting Hrg. on

Int. No. 439 before Comm. on Gen. Welfare, at 22:12-23:5 (Oct. 16, 2003); and Hrg. on Int. No.

22 before Comm. on Gen. Welfare, at 60:25-61:5 (Sept. 22, 2004)))

   As an initial matter, Defendants' assertion that Morse "nowhere acknowledges

even the existence of the 2003 and 2004 proposed amendments to the definition of 'marital

status'" is flatly wrong.  As discussed above, Morse (1) cites Intro 22; (2) acknowledges that

Intro 22 "made specific provision for the expansion of marital status coverage"; (3) states that

"the Council explicitly chose another path for changing the definition of marital status" – i.e., it

"left the interpretation of 'marital status' to the courts"; and (4) observes that "[t]he reasons the

Council did not [ultimately] add a marital status provision in 2005 are open to speculation."

Morse, 165 A.D.3d at 71-72 & n.5.  In sum, Morse does not ignore the Restoration Act's

legislative history, as Defendants argue.  Instead, Morse explicitly addresses the Act's legislative

history and concludes that the City Council "left the interpretation of 'marital status' to the

courts."  Id.

   In any event, Defendants' interpretation of the Restoration Act's legislative

history does not amount to "persuasive evidence" that the New York Court of Appeals – if

confronted by the "marital status" issue addressed in Morse – "would decide otherwise."  West,

311 U.S. at 237.

   To begin, the City Council did not define – either in the text of the Restoration

Act or in other statements accompanying that legislation – the meaning of "marital status."  The

City Council likewise did not explain why the proposed language regarding "marital status" was

not adopted.  Although Defendants cite testimony offered during hearings concerning the Act,

the intent of the City Council cannot be reliably discerned from the testimony of the witnesses

who appear before it.  See Harry Fox Agency, Inc. v. Mills Music, Inc., 543 F. Supp. 844, 864

(S.D.N.Y. 1982) ("statements made at committee hearings by representatives of various interests

are entitled to little if any weight in interpreting Congressional intent," because "the views

expressed by witnesses are not necessarily the same as those of the legislators ultimately voting

on the bill"), rev'd on other grounds, 720 F.2d 733 (2d Cir. 1983), rev'd sub nom. Mills Music,

Inc. v. Snyder, 469 U.S. 153 (1985), and aff'd on remand, 779 F.2d 35 (2d Cir. 1985); Food

Mktg. Inst. v. Argus Leader Media, 139 S. Ct. 2356, 2364 (2019) ("'excerpts from committee

hearings' are 'among the least illuminating forms of legislative history'") (quoting Advocate

Health Care Network v. Stapleton, 581 U.S. 468, 481 (2017); further quotation omitted).

As to Defendants' argument that <u>Morse</u> erroneously "'adopt[s] [an] interpretation'" of the NYCHRL that "'would read back into the . . . Act the very [language] that the [legislative body] deleted,'" and that courts "'ordinarily will not assume that [the legislature] intended to enact statutory language that it has <u>earlier discarded in favor of other language</u>'" (Def. Br. (Dkt. No. 32) at 16-17 (quoting <u>Chickasaw Nation</u>, 534 U.S. at 93) (emphasis in Def. Br.)), decisions from the New York Court of Appeals demonstrate that that court does not always determine the meaning of a statute by reference to language from earlier bills that was omitted in the enacted provision. <u>See, e.g.</u>, <u>People v. Thomas</u>, 33 N.Y.3d 1, 12 n.9 (2019) ("[T]he dissent cites the legislature's failure to enact the Advisory Committee on Criminal Law and Procedure's proposed amendment to the predicate felony statutes that would more clearly state that the original sentence date applies in cases such as this.  Legislative inaction, however, 'is a weak reed upon which to lean in determining legislative intent.'   It is equally likely that the legislature has failed to enact the proposed amendment because it recognized, as we hold today, that the predicate felony statutes already unambiguously require sentencing courts to look to the date of the original sentence.") (quoting <u>Flanagan v. Mount Eden Gen. Hosp.</u>, 24 N.Y.2d 427, 433 (1969); and citing <u>People v. Ocasio</u>, 28 N.Y.3d 178, 183 n.2 (2016)).  In sum, while it is possible that the New York Court of Appeals would give weight to the legislature's decision not to enact the twice-proposed definition of marital status to include "marital status of a person in relation to another person," this possibility does not constitute "persuasive evidence" that it would necessarily do so.

Given the City Council's clearly expressed intent to expand the boundaries of the NYCHRL to show "no tolerance for discrimination in public life," Comm. Rept. of the Govt. Affairs Div., Comm. on Civ. Rights at 8 (Mar. 8, 2016), this Court cannot find that the <u>Morse</u>

court's interpretation of "marital status" as used in the NYCHRL would necessarily be rejected by the New York Court of Appeals.

### 3.   Defendants' Arguments Regarding Construction of the NYCHRL

While Defendants acknowledge that this Court is obligated "to construe the NYCHRL broadly in favor of the plaintiff," and that the NYCHRL "includes a liberal construction requirement," they contend that these factors do not justify the Morse court's interpretation of "marital status."  (Def. Br. (Dkt. No. 32) at 18)

In this regard, Defendants argue that

[t]he Second Circuit's approach in Beason v. United Technologies Corp., 337 F.3d 271, 282 (2d Cir. 2003) is instructive relative to refuting Morse's and Plaintiff's purported reliance on liberal construction.  There, the Second Circuit refused to construe Connecticut's anti-discrimination statute to cover discrimination against "perceived" physical disability, where the legislature "could have expressly adopted a cause of action for" such discrimination, but declined to do so.  Id. at 280.  Despite the general rule that such "remedial statutes should be construed liberally," the Court rightly refused to recognize a protected category that the legislature did not itself include in the statute.  Id. at 282.  Here, the legislative history behind the Act compels the same result because the NYC Council twice considered the expanded definition of "marital status" and rejected it before the Morse court rendered its decision.

(Id. at 18)  Beason is of no assistance to Defendants.

As an initial matter – and unlike in the instant case – there were no on-point state appellate court decision in Beason.  See Beason, 337 F.3d at 281 ("In light of [the] scant precedent premised entirely on a single state trial court opinion we are not persuaded that our analysis is wrong.").  And while the Connecticut Supreme Court generally "interprets remedial statutes 'liberally in order to effectuate the legislature's intent,'" Beason, 337 F.3d at 271 (quoting Comm'n on Human Rights & Opportunities v. Sullivan Assocs., 250 Conn. 763, 782 (1999)), the NYCHRL is not a typical remedial statute.  Contained in the text of the NYCHRL itself is a strikingly broad directive regarding construction – that the NYCHRL "shall be

construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York state civil and human rights laws, including those laws with provisions worded comparably to provisions of this title, have been so construed." N.Y.C. Admin Code § 8-130(a).  Finally, Connecticut's general assembly had "introduced the element of [perceived status into other provisions of] the state's anti-discrimination laws," but did not include this concept in its statute regarding discrimination on the basis of physical disability.  The statutory scheme as a whole thus indicated that the general assembly intended to exclude perceived physical disability from the definition of physical disability.  Beason, 337 F.3d at 280 (citing Conn. Gen. Stat. § 46a-81(a) (discrimination on the basis of perceived sexuality), and § 46a-51(20) (discrimination on the basis of perceived mental disability)).  Defendants have cited no such comparator in the NYCHRL – i.e., another protected status that, unlike marital status, is defined to include status with respect to another person.

Defendants go on to argue that "the NYC Council selected two relationship categories to receive protection under the NYCHRL and the [Restoration] Act – 'marital status' and 'partnership status,'" with the latter term defined as "the status of being in a domestic partnership."  N.Y.C. Admin. Code § 8-102.  According to Defendants, "[n]o general rule of liberal construction can override those specific categories and add a new relationship status to the NYCHRL – especially a relationship status that the NYC Council considered and omitted." (Def. Br. (Dkt. No. 32) at 19 (emphasis in original))  And "the definitions of other protected 'statuses' in the statute confirm that th[e] term 'status' refers to a category or characteristic – not one's relationship with a particular person."  (Def. Reply Br. (Dkt. No. 34) at 9)

That the NYCHRL defines "partnership status" as "the status of being in a domestic partnership," but does not so define "marital status," undermines rather than supports

Defendants' argument here, however. "It is well established that '[w]here [a legislature] includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that [the legislature] acts intentionally.'" Ziparo v. CSX Transportation, Inc., 15 F.4th 153, 161 (2d Cir. 2021) (quoting Russello v. United States, 464 U.S. 16, 23 (1983)) (brackets in Ziparo). Courts may not "violate that principle by declining to give any effect to the conspicuous omission of [limiting] language from [one] provision." Id. Accordingly, this Court will not read the NYCHRL's restrictive definition of "partnership status" into the term "marital status."

Defendants also argue that although "courts must 'constru[e] the NYCHRL's provisions "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible'" . . . [i]t [would] . . . not [be] reasonable to apply a liberal construction of the Act that would have the effect of adopting the very definition of 'marital status' that the NYC Council considered and rejected." (Def. Br. (Dkt. No. 32) at 18 (quoting Mihalik, 715 F.3d at 109) (in turn quoting Albunio, 16 N.Y.3d at 477-78)) For the reasons discussed above, however, the legislative history cited by Defendants does not demonstrate that the New York Court of Appeals would necessarily reject Morse's interpretation of the NYCHRL's "marital status" provision as "unreasonable."[4]

_____

[4] Defendants cite Chauca v. Abraham, 30 N.Y.3d 325 (2017), and Doe v. Bloomberg L.P., 36 N.Y.3d 450 (2021), for the proposition that "the NYCHRL must be interpreted reasonably, including by construing terms of art consistently with their common-law meanings, use in analogous statutes, and the language of the NYCHRL as a whole." (Def. Reply Br. (Dkt. No. 34) at 11-13 (emphasis in original)) These cases reject as "unreasonable" interpretations of the NYCHRL that contradict the common law and/or the text and structure of the statute. See Chauca, 30 N.Y.3d at 331 (holding that, under the NYCHRL, a plaintiff is not "entitled to a punitive damages charge upon any showing of liability"; and citing, inter alia, tort and insurance cases for the proposition that "'punitive damages' . . . is a legal term of art that has meaning under the New York common law") (emphasis in original); Bloomberg, 36 N.Y.3d at 453, 460-

In sum, Defendants' arguments regarding limitations on the NYCHRL's "liberal construction" provision do not constitute "persuasive evidence" that <u>Morse</u> was wrongly decided.

### 4.   **Defendants' Arguments Regarding Anti-Nepotism Policies**

Finally, Defendants argue that "before adopting <u>Morse</u>'s definition of marital status, this Court should consider the consequences of such a sweeping definition.  In particular, this definition would render virtually all anti-nepotism policies adopted by NYC employers illegal under the NYCHRL."  (Def. Br. (Dkt. No. 32) at 19)

In support of this argument, Defendants point out that Intro 22 provided that (1) "[t]he term 'marital status' refers both to the marital status of a person in isolation, and to the marital status of a person in relation to another person"; and (2) "[t]he provisions of this section as they relate to discrimination on the basis of marital status shall not be construed to prohibit an anti-nepotism policy where such a policy is not a subterfuge to evade the purposes of this chapter."  N.Y. City Council, Comm. on Gen. Welfare, Int. No. 22 ("Intro 22") §§ 2-3 (Sept. 22,

---

61 (rejecting plaintiff's argument that a company's "Co-Founder, Chief Executive Officer, and President" "was her 'employer' and as a result was subject to vicarious liability under the [NYCHRL]"; noting that "employees and agents of a company" and "shareholders" are not "understood to be 'employers'" or "subject to vicarious liability" at common law; noting that multiple provisions of the NYCHRL differentiate – explicitly or implicitly – among companies and their agents and/or owners).

Here, by contrast, Defendants have demonstrated no inconsistency between (1) the <u>Morse</u> court's interpretation of "marital status" and (2) the use of "marital status" in the common law, "analogous statutes," and/or "the NYCHRL as a whole."  While Defendants argue that "the definition of 'marital status' as a term of art has been well established," they cite only to New York State Human Rights Law ("NYSHRL") cases and to a case involving a Federal employment regulation that is interpreted by reference to Title VII.  (Def. Reply Br. (Dkt. No. 34) at 12-13)  It is well established, however, that the NYCHRL is not to be interpreted in accordance with cases brought under the Title VII and the NYSHRL; indeed, the NYCHRL explicitly says as much.  <u>See</u> N.Y.C. Admin. Code § 8-130(a).

2004) (available at Dkt. No. 33-2).  Defendants contend that this "legislative history clearly reveals that the NYC Council considered the anti-nepotism issue when it proposed the 2003 and 2004 amendments," and that the Restoration Act "avoided this concern" by not enacting Intro 22's proposed definition of "marital status."  (Def. Br. (Dkt. No. 32) at 19-20)  Defendants further cite Cerullo, the 2010 ALJ decision discussed above, which adopts Defendants' proposed definition of "marital status" in part to avoid casting doubt on anti-nepotism policies.  (Id. at 20-21 (citing Cerullo, 2010 NY OATH LEXIS 428, at *15-16))

The instant case involves no anti-nepotism policy, however, and the generalized policy concern cited by Defendants does not permit this Court to disregard a First Department decision that is squarely on-point.  And Defendants' reliance on an ALJ decision for an issue of statutory interpretation is misplaced, for the reasons discussed in Morse.  See Morse, 165 F.3d at 70 ("[An] ALJ decision is not entitled to deference by courts.  '[W]here the question is one of pure statutory reading and analysis, . . . there is little basis to rely on any special competence or expertise of the administrative agency,' and 'courts are free to ascertain the proper interpretation from the statutory language and legislative intent.'") (quoting Smith, 61 A.D.3d at 508-509).

\*       \*       \*       \*

Defendants have not proffered "persuasive evidence" that the New York Court of Appeals would reject the First Department's reasoning in Morse.  This Court is therefore constrained to follow Morse's ruling that, under the NYCHRL, "'[m]arital status' may refer to . . . whether two individuals are married to each other or not married to each other."  Morse, 165 A.D.3d at 68.  Given Hunter's allegation that he was terminated because of his impending divorce from Wendy Williams – i.e., terminated because he would no longer be married to

Williams – <u>Morse</u> requires this Court to find that he has stated a claim for marital status

discrimination under the NYCHRL.[5]

_____

[5] This Court's conclusion that Defendants have not satisfied the "persuasive evidence" standard does not mean that this Court agrees with <u>Morse</u>'s interpretation of "marital status" as used in the NYCHRL. Indeed, <u>Morse</u>'s definition of "marital status" is not supported by (1) the ordinary meaning of that term; (2) the NYCHRL's legislative purpose; (3) the Restoration Act's treatment of <u>Levin</u>; or (4) the broader legislative history of the Restoration Act.

As to the ordinary meaning of "marital status," Black's Law Dictionary – which the New York Court of Appeals has recently cited in a NYCHRL case, <u>see Bloomberg</u>, 36 N.Y.3d at 360 – defines that term as "[t]he condition of being single, married, legally separated, divorced, or widowed." <u>Marital Status</u>, Black's Law Dictionary (11th ed. 2019). This meaning accords with the use of the term in everyday speech. <u>See Manhattan Pizza Hut</u>, 51 N.Y.2d at 511-12 ("when one is queried about one's 'marital status,' the usual and complete answer would be expected to be a choice among 'married,' 'single,' etc., but would not be expected to include an identification of one's present or former spouse. . . .").

As to the NYCHRL's legislative purpose, the opening provision of that statute states that "there is no greater danger to the health, morals, safety and welfare of the [City of New York] and its inhabitants than the existence of groups prejudiced against one another and antagonistic to each other because of their actual or perceived differences, including those based on . . . marital status [or] partnership status." N.Y.C. Admin. Code § 8-101. The NYCHRL – like other anti-discrimination laws – is thus focused on discriminatory animus directed at particular groups or classes of people. <u>See Discrimination</u>, Black's Law Dictionary (11th ed. 2019) (defining "discrimination" as "[t]he effect of a law or established practice that confers privileges on a certain class or that denies privileges to a certain class").

As to the Restoration Act's treatment of <u>Levin</u>, <u>Morse</u> misconstrues which portions of <u>Levin</u> were abrogated by the Restoration Act and why. In <u>Levin</u>, plaintiffs were unmarried lesbians. Plaintiffs and their partners had been denied medical student housing at Yeshiva University's Albert Einstein College of Medicine. The university restricted housing to married couples and their children. <u>Levin</u>, 96 N.Y.2d at 489-90. Plaintiffs sued the university for marital status discrimination in violation of, <u>inter alia</u>, the NYCHRL. The New York Court of Appeals rejected the claim, finding that the university's "policy did not discriminate on the basis of marital status on its face. . . , but instead validly limited occupancy to only those in a legal, family relationship with [a medical student]." <u>Id.</u> at 490-91.

In sum, the plaintiffs in <u>Levin</u> – unlike the plaintiffs here and in <u>Morse</u> – did not claim that they were subject to discrimination because of the identity of their partner or spouse. Instead, plaintiffs complained that the university had denied them housing pursuant to a policy excluding unmarried couples, and it was this policy that the <u>Levin</u> plaintiffs argued violated their right to be free from marital status discrimination. And that is the argument the <u>Levin</u> court rejected in stating that "a distinction must be made between the complainant's marital status as such, and the

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is denied.  The Clerk

of Court is directed to terminate the motion (Dkt. No. 31).  The Court will conduct a conference,

pursuant to Rule 16 of the Federal Rules of Civil Procedure, on **September 14, 2023 at 10:30**

**a.m.** in Courtroom 705 of the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York,

---

existence of the complainant's disqualifying relationship – or absence thereof – with another
person." Id. at 490.  Levin says nothing about discrimination premised on the individual to
whom someone is or is not married.

The Restoration Act abrogates Levin to the extent that it adds "partnership status" as a protected
status under the NYCHRL, and to the extent that the Act's liberal construction provision is
inconsistent with Levin's reasoning.  But Morse errs in concluding that the City Council's
abrogation of Levin implies an intent to create a cause of action for marital status discrimination
based on the identity of the complainant's spouse.  As discussed above, the identity of the spouse
or partner was irrelevant in Levin; the case turned on the fact that the Levin plaintiffs were not
married.

Finally, as to the Restoration Act's broader legislative history, Defendants accurately point out
that (1) two prior drafts of the Restoration Act contained language defining "marital status" to
include "the marital status of a person in relation to another person" (N.Y. City Council, Comm.
on Gen. Welfare, Int. No. 439 (Apr. 30, 2003)), and Int. No. 22 (Sept. 22, 2004)); and (2) that
language does not appear in the legislation as enacted.  While this Court has concluded that this
argument does not amount to "persuasive evidence" that the New York Court of Appeals would
overturn Morse, Defendants' argument is not without force.

Morse cannot be disregarded by this Court simply because of a concern about its reasoning,
however.  This Court must instead find that there is "persuasive evidence" that the New York
Court of Appeals would reject the First Department's reasoning, and that is a standard that
Defendants have not met.

New York.  The parties should consult this Court's individual rules of practice and submit a joint

letter and proposed case management plan one week prior to the conference.

Dated: New York, New York
      September 1, 2023

                      SO ORDERED.

                      _____
                      Paul G. Gardephe
                      United States District Judge