UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

KELVIN HUNTER,

                Plaintiff,


      -against-


DEBMAR-MERCURY LLC, IRA BERNSTEIN,

MORT MARCUS, and JOHN and JANE DOE 1–5,

(employees, agents, or subsidiaries of Debmar-Mercury LLC not yet known),


                Defendants.

--------------------------------------------------------------X

Civil Action No.: 1:22-CV-01687-PGG


**FIRST AMENDED COMPLAINT (with Exhibits A-H)**


**PRELIMINARY STATEMENT**

1.  Plaintiff Kelvin Hunter ("Plaintiff") brings this action against Defendants for their
unlawful decision to terminate him as Executive Producer of The Wendy Williams Show
on the basis of his marital status and in breach of contractual rights conferred upon him
under the parties' agreements.

2.   Defendants' conduct constitutes unlawful discrimination under the New York City Human Rights Law, breach of contract, unjust enrichment, and violations of federal statutes, including 42 U.S.C. § 1981, and Title VII.

3.   On appeal, the Second Circuit vacated the District Court's denial of Debmar-Mercury's motion to dismiss Plaintiff's claim under the NYCHRL, holding that the City Human Rights Law's protections for "marital status" apply only to one's legal condition (e.g., married, single, divorced), and not to employment decisions based on one's relationship to a particular individual—here, Wendy Williams.

4.   Plaintiff seeks compensatory and punitive damages, restitution, an award of costs, interest and attorneys' fees, and such other and further relief as this Court deems just and proper.

## JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction over the claims asserted in this action based on diversity jurisdiction under 28 U.S.C. § 1332, in that there is complete diversity among the parties, and the amount in controversy exceeds $75,000.

6.   This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, including 42 U.S.C. § 1981, and Title VII of the Civil Rights Act of 1964.

7.   This Court has supplemental jurisdiction over related state and city claims pursuant to 28 U.S.C. § 1367.

8.   Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(2), in that the Southern District of New York is the judicial district in which a substantial part of the events giving rise to Plaintiff's claims occurred.

9.  This Court has personal jurisdiction over Defendants because Defendants conduct regular business in the State of New York.

## JURY TRIAL DEMAND

10. Plaintiff demands a trial by jury on each and every one of his claims as pleaded herein.

## THE PARTIES

11. Plaintiff Kelvin Hunter is an individual residing in Broward County, Florida.

12. Defendant Debmar-Mercury LLC ("Debmar") is a California limited liability company with its principal offices in Santa Monica, California, and an office at 75 Rockefeller Center, 16th Floor, New York, NY 10010.

13. Defendants Ira Bernstein and Mort Marcus are the co-presidents and owners of Debmar, and residents of California.

14. Defendants John and Jane Doe 1–5 are employees, agents, or subsidiaries of Debmar whose identities are presently unknown.

## FACTUAL ALLEGATIONS

15. In November 2007, Debmar entered into a production agreement with Wendy, Inc. for The Wendy Williams Show. That agreement expressly conferred upon Plaintiff the role of Executive Producer and detailed his rights to compensation, including a salary, executive credit, and commissions on product integrations and co-branding opportunities. See Exhibit A (November 5, 2007 Term Sheet Between Wendy Inc. and Defendant).

16. Plaintiff served as Executive Producer from 2007 until April 2019, contributing to the Show's brand, creative segments, guest selection, and marketing partnerships.

17. Plaintiff generated and secured valuable product integrations for which he was contractually entitled to a 10% commission, including post-term commissions on integrations he originated. See Exhibit B (Stephen Barnes email confirming integration commission terms to be contracted). See Exhibit C (email thread between plaintiff and defendants Controller, Karrie Komaru confirming the commission agreement and subsequent payment made)

18. On April 18, 2019, shortly after Wendy Williams filed for divorce, Defendants terminated Plaintiff's role without cause, citing no performance-based reason.

19. On or about April 2019, Defendants Ira Bernstein and Mort Marcus issued a written Notice of Termination, stating that Plaintiff's role as Executive Producer was terminated effective immediately. See Exhibit D (Letter of Termination).

20. Defendants have since retained the benefits of Plaintiff's contributions and product integrations while depriving him of contractually owed compensation. See Exhibit C (Stephen Barnes email confirming integration commission terms). See Exhibit B (Stephen Barnes email confirming integration commission terms to be contracted). See Exhibit C (email thread between plaintiff and defendants Controller, Karrie Komaru confirming the commission agreement and subsequent payment made).

21. On appeal, the Second Circuit vacated the District Court's denial of Debmar-Mercury's motion to dismiss Plaintiff's claim under the NYCHRL, holding that the City Human Rights Law's protections for "marital status" apply only to one's legal condition (e.g., married, single, divorced), and not to employment decisions based on one's relationship to a particular individual—here, Wendy Williams.

**FIRST CAUSE OF ACTION**
(NYCHRL – Marital Status Discrimination, N.Y.C. Admin. Code § 8-107) [Vacated on Appeal]

22. Plaintiff incorporates by reference all preceding allegations.

23. Plaintiff's claim under the NYCHRL for marital-status discrimination based on his relationship to a specific individual—Wendy Williams—has been reversed by the Second Circuit because the law's protections extend only to one's general marital condition (e.g., married, divorced), not to whom one is or was married. See Hunter v. Debmar-Mercury, 24-1229 (2d Cir. Apr. 8, 2025).

24. This cause of action is included here for procedural completeness only and will be addressed on remand in accordance with the Second Circuit's instructions.

**SECOND CAUSE OF ACTION**
(Breach of Contract – Third-Party Beneficiary)

25. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

26. On or about November 5, 2007, Defendant Debmar-Mercury LLC entered into a written production agreement with Wendy, Inc. (the "2007 Agreement"), pursuant to which Wendy Williams would host The Wendy Williams Show and Plaintiff Kelvin Hunter would serve as Executive Producer of the program.

27. The 2007 Agreement and subsequent amendments expressly identified Plaintiff by name and conferred upon him the title and role of Executive Producer, as well as rights to compensation, including an executive producer credit and commissions on product integrations and co-branding opportunities that he originated for the Show. See Exhibit E

(Email chain confirming Plaintiff's involvement in the creation of the Wendy Williams Show logo).

28. The parties' course of dealing further confirmed Plaintiff's intended beneficiary status. For example:

a. A January 9, 2012 memorandum to Defendants Mort Marcus and Ira Bernstein memorialized Debmar's agreement that Wendy, Inc. and its affiliates would receive 15% of product integration fees and ancillary exploitation, terms negotiated and implemented by Plaintiff in his role as Executive Producer. See Exhibit F (Plaintiff email to defendants Negotiation of Wendy Williams Contract Terms w/ DebMar Mercury) Stephen Barnes email confirming integration commission terms).

b. A written integration commission agreement provided that Plaintiff's corporate entity, 53rd West Management, Inc., would "receive a 10% commission on all integrations brought by Kevin Hunter, minus net costs," a promise acknowledged and performed by Debmar through direct payments to Plaintiff's company. See Exhibit G (2016 Emails confirming Plaintiff was classified as a corporate entity, not a W-2 employee).

c. Debmar's Controller confirmed that such commission payments were processed and made payable to Plaintiff's company and mailed to Plaintiff, demonstrating the parties' recognition of Plaintiff's direct and enforceable rights under the governing agreements See Exhibit C. See Exhibit B (Stephen Barnes email confirming integration commission terms).

d. Internal correspondence reflecting Debmar's production executive confirmed that Plaintiff "is not on payroll" but was instead paid "via accounts payable through his Inc. … 53rd Mgmt Inc is a corporate entity therefore there is no W-2 or 1099,"

establishing that Plaintiff's compensation flowed directly from contractual arrangements between Debmar and Wendy, Inc. in which he was expressly named as a beneficiary. See Exhibit G (2016 Emails confirming Plaintiff was classified as a corporate entity, not a W-2 employee).

e.  A written agreement further guaranteed Plaintiff's Executive Producer credit on The Wendy Williams Show, cementing his role as an intended contractual beneficiary Exhibit D.

29. By virtue of the 2007 Agreement, related amendments, and subsequent performance, Plaintiff was an intended third-party beneficiary entitled to enforce the contractual promises made for his benefit, including his role as Executive Producer and his right to commissions, credit, and compensation. See Exhibit A (November 5, 2007 Term Sheet Between Wendy Inc. and Defendant). See Exhibit H (Aug. 21, 2009 Email from Lonnie Burstein urging closure of contract amendment).

30. On or about April 18, 2019, Defendants wrongfully and unlawfully terminated Plaintiff's role as Executive Producer, in direct violation of the 2007 Agreement and subsequent commission arrangements See Exhibits D, A, and C.

31. Defendants further breached the 2007 Agreement and related obligations by:

a.  Removing Plaintiff's contractual credit as Executive Producer of the Show;

b.  Ceasing to pay commissions rightfully owed to Plaintiff on product integrations he secured, despite continuing to profit from those integrations; and

c.  Retaining the benefits of Plaintiff's creative contributions, branding strategies, and integration relationships without providing the compensation contractually required. See Exhibits A, and C.

32. As a direct and proximate result of Defendants' breaches, Plaintiff has suffered damages including, but not limited to: lost salary, lost commissions, lost Executive Producer credit, loss of professional reputation, and consequential damages in an amount to be determined at trial, but believed to exceed several million dollars.

33. Defendants have been unjustly enriched by continuing to profit from product integrations, branding, and creative contributions that Plaintiff originated under the 2007 Agreement without providing him the compensation required by contract. See Exhibit A.

### THIRD CAUSE OF ACTION
(Unjust Enrichment – Pled in the Alternative)

34. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

35. Defendants have derived and continue to derive substantial financial benefits from Plaintiff's years-long work and contributions as Executive Producer of The Wendy Williams Show. Plaintiff's contributions included, but were not limited to:

a. creating, developing, and branding signature segments such as "Hot Topics," "Shoe Cam," "Hot Seat," the "Hot Topics Round Table," "The Money Booth," "The Audience Mic," and interactive audience-participation formats;

b. cultivating and maintaining relationships with recording artists, record labels, and entertainment industry partners;

c. exercising final approval of musical performances, guest interviews, and product integration deals;

d. recruiting, hiring, and mentoring production staff, including efforts to expand minority representation;

e.   securing and negotiating lucrative product integrations and co-branding agreements;

f.   developing and executing promotional campaigns, including the 30-city "Hot Topics Promotional Tour"; and

g.   conceptualizing the "Co-Host" format, inviting celebrity fan favorites to appear alongside Ms. Williams.

36. Defendants recognized and compensated Plaintiff for many of these contributions through course-of-dealing arrangements, including the 10% commission on integrations he secured, payments to his company 53rd West Management, Inc., and contractual guarantees of his Executive Producer credit. See Exhibit C.

37. After abruptly terminating Plaintiff in April 2019, Defendants ceased paying him commissions and removed his Executive Producer credit, while continuing to exploit the integrations, creative concepts, and industry relationships that he originated.

38. Defendants' ongoing use of Plaintiff's contributions, including incorporation of his creative works and integration relationships into successor programming such as the Sherri Shepherd Show, underscores that Defendants continue to reap financial benefits without compensating Plaintiff.

39. Even if Plaintiff were not deemed an intended third-party beneficiary of the 2007 Agreement and related contractual arrangements, principles of equity and good conscience require that Defendants provide restitution. It would be unjust to allow Defendants to retain the benefits of Plaintiff's creative and financial contributions without paying him the value thereof. See Exhibit A.

40. As a direct and proximate result, Plaintiff has suffered damages in an amount to be determined at trial, but believed to exceed $10,000,000.

## FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1981 – Interference with Contractual Rights)

41. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

42. Plaintiff's employment and compensation rights were contractually derived from the 2007 Agreement between Debmar-Mercury LLC and Wendy, Inc. See Exhibit A.

43. Defendants intentionally interfered with Plaintiff's contractual rights by terminating him and depriving him of compensation and commissions, at least in part because of his race and in contrast to the treatment afforded to non-Black executives in comparable circumstances.

44. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Title VII – Sex Discrimination via Gender Stereotyping)

45. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

46. Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., prohibits employers from discharging or otherwise discriminating against an employee on the basis of sex.

47.  Title VII's protections extend to situations where an employer acts on the basis of sex-based stereotypes, including expectations about how men and women should behave in their familial and marital roles.

48. At all relevant times, Plaintiff was employed as Executive Producer of The Wendy Williams Show, a position he had held since the inception of the program.

49. On or about April 18, 2019, shortly after Plaintiff's then-wife Wendy Williams publicly announced divorce proceedings, Defendants terminated Plaintiff's role. See Exhibit D.

50. Defendants' decision to terminate Plaintiff was not based on performance, misconduct, or legitimate business needs. Rather, the termination was influenced by sex-based stereotypes that cast Plaintiff, as a man, in the role of an unfaithful or disloyal husband who was therefore unfit to continue in a leadership role.

51. Defendants' actions reflect gendered assumptions that men who engage in marital discord or public divorce scandals are inherently culpable, untrustworthy, or unprofessional — stereotypes that would not have been applied in the same manner to a female executive spouse in comparable circumstances.

52. By terminating Plaintiff's employment because of these stereotypes, Defendants discriminated against Plaintiff because of his sex, in violation of Title VII.

53. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer substantial damages, including lost salary, lost commissions, loss of professional reputation, emotional distress, humiliation, and mental anguish.


**SIXTH CAUSE OF ACTION**
(Common Law Copyright Infringement – Unassigned Works)

54. Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

55. During the course of his work, Plaintiff created and contributed to original works of authorship, including program segments, promotional strategies, and branding concepts such as the Wendy Williams Show logo. See Exhibit E.

56. Plaintiff Kelvin Hunter, during the course of his work on The Wendy Williams Show, created and contributed to original creative works of authorship, including but not limited to:

 a. the design, structure, and format of recurring segments such as "Hot Topics", "Shoe Cam", "Hot Seat", the "Hot Topics Round Table", The "Money Booth", The "Audience Mic", and "Audience Participation";

 b. original concepts, treatments, outlines, and creative direction for audience interaction and on-air programming;

 c. development of distinctive promotional strategies and integrated marketing concepts tied to the Show; and

 d. branding ideas, taglines, and production concepts incorporated into the identity of the Show.

57. These works constitute original works of authorship within the meaning of the Copyright Act and under common law copyright principles.

58. At no time did Plaintiff execute a work-for-hire agreement, copyright assignment, or other instrument transferring ownership of his creative works to Defendants.

59. Accordingly, Plaintiff retains ownership of the copyrights and common law rights in and to his original contributions.

60. Defendants have, without authorization, reproduced, distributed, publicly performed, and otherwise exploited Plaintiff's creative contributions, both during his tenure and continuing after his termination, including through successor programming and derivative works.

61. Defendants' conduct constitutes infringement of Plaintiff's copyright and common law rights.

62. As a direct and proximate result, Plaintiff has suffered substantial damages, including lost licensing revenues, lost control over

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully demands judgment against Defendants, jointly and severally, as follows:

63. For compensatory damages in an amount to be determined at trial, but not less than $10,000,000;

64. For punitive damages against the individual Defendants;

65. For restitution and disgorgement of unjust enrichment;

66. For injunctive and equitable relief restoring Plaintiff's rights;

67. For reasonable attorneys' fees, together with costs and disbursements;

68. For pre- and post-judgment interest as allowed by law; and

69. For such other and further relief as this Court may deem just and proper.

Dated: September 10, 2025

New York, New York

Respectfully submitted,



Kelvin Hunter

Pro Se Plaintiff

1440 Coral Ridge Drive #223

Coral Springs, FL, 33071

Tel: 646-763-0834

Email: hkinc917@gmail.com

# EXHIBIT A

# TERM SHEET

    This binding term sheet (this "**Term Sheet**") is entered into as of November 5, 2007 between Wendy, Inc. ("**Lender**") for the services of Wendy Williams ("**WW**") and Debmar/Mercury LLC ("**DM**") and sets forth the basic terms and conditions of the parties' agreement with respect to WW's host services in connection with possible episodes of a proposed 1-hour television talk show series tentatively entitled "The Wendy Williams Show" hosted by WW (the "**Series**"). In consideration of the mutual promises set forth below, the parties agree as follows:

    1.    **Test:**   DM has the right to engage Lender to cause WW to render host services for episodes of the Series for a test period of up to 18 months (as designated by DM in writing), which period will commence during the first 6 months of 2008 at such time, if any, as DM notifies Lender or WW in writing (the "**Test Period**"). DM has the right to produce as many or as few episodes of the Series during the Test Period as DM determines. It is contemplated that the Series, if produced, will be produced on a 5 episode per week basis.

    2.    **Test Fee:** Provided that neither Lender nor WW is in default hereof, for each week during the Test Period in which DM tapes episodes of the Series and WW renders and fully completes host services in connection with all such episodes, Lender is entitled to the following fees:

        a.    $▮▮▮/week during the first 6 months of the Test Period;

        b.    $▮▮▮/week during the second 6 months of the Test Period; and

        c.    $▮▮▮/week during the last 6 months of the Test Period.

    3.    **Options:**  DM will have 5 consecutive options (each, an "**Option**") to engage Lender to cause WW to render host services during each of 5 production years. DM may exercise the first Option at any time prior to the expiration of the Test Period (subject to extension for Lender's or WW's default or WW's disability and for force majeure). DM may exercise any subsequent Option no later than 6 months after completion of taping of episodes during the then-current production year of the Series (subject to extension for Lender's or WW's default or WW's disability and for force majeure). During the Test Period, if DM produces episodes of the Series and broadcasts such episodes in markets covering more than 85% of the television households in the U.S., then DM will exercise the first Option (and, for the avoidance of doubt, the Test Period will end). A production year will be a period of 12 months from the commencement of production of episodes of the Series during such production year as designated by DM (exclusive of any episodes produced during the Test Period). DM has the right to produce as many or as few episodes of the Series during each production year as DM determines.

    4.    **Host Compensation**:  For each Series production year that DM exercises an Option for Lender to provide WW's services hereunder, provided that neither Lender nor WW is in default hereof and WW renders and fully completes host services in connection with all episodes of the Series produced or scheduled to be produced during such production year hereunder, DM will pay Lender $▮▮▮ the "**Host Compensation**"), provided that the Host Compensation will increase by 5% (cumulatively) for each of the second and third production years of the Series and will increase by 10% (cumulatively) for each of the fourth and fifth production years of the Series (i.e., the Host Compensation will be $▮▮▮ for the second production year, $▮▮▮ for the third production year, $▮▮▮ for the fourth production year, and $▮▮▮ for the fifth production year). The Host Compensation will be payable over the course of production of the Series during each production year the manner that DM in its reasonable discretion determines. The Host Compensation is an advance against the Back-End. Notwithstanding the foregoing, if production of the Series is cancelled prior to the completion of production of 35 weeks of episodes of the Series during any production year the Host Compensation will be reduced pro rata.

    5.    **Back-End:** Provided that neither Lender nor WW is in default hereof, Lender will be entitled to an amount equal to 15% of the Net Proceeds (defined, computed and paid in accordance with DM's standard Net

Proceeds definition) in connection with all episodes of the Series for which WW renders and fully completes host services hereunder.

      6.     **First Negotiation/Last Refusal Rights**: If DM exercises all 5 Options, then if WW desires to render host services in connection with a talk show after the expiration of the exclusivity period, then DM will have customary rights of first negotiation and last refusal/matching right to engage WW to render host services in connection with additional episodes of the Series. If DM elects not to exercise any of the 5 Options and WW desires to render host services in connection with a talk show after the expiration of the exclusivity period pursuant to an agreement that is less favorable to WW than the agreement that WW would have with DM if DM exercised such Option, then DM will have a customary right of last refusal/matching right to engage WW to render host services in connection with additional episodes of the Series.

      7.     **Host Services**: Lender will cause WW to render, and WW will render, all services customarily rendered by talk show hosts of first class talk shows in the television industry in connection with the development, pre-production, production, post-production, and promotion of, and publicity with respect to, the Series and as otherwise required by DM. Lender will cause WW to render, and WW will render, host services as, when and where required by DM, and such services will be subject to DM's direction and control at all times.

      8.     **Exclusivity**:

           a.     During the Test Period, WW's services will be subject to WW's current on-air schedule (i.e., Monday through Friday, 2:00 pm EST to 7:00 pm EST) in connection with WW's radio show, "the Wendy Williams Experience" (the "Radio Show"), which DM will schedule around. WW's services will otherwise be first priority to the Series and exclusive in television (other than WW's special appearances on the Fox morning show, Entertainment Tonight and the Today Show [collectively, "Other Shows"], which special appearances DM will have the right to approve, such approval not to be unreasonably withheld). Without limiting the foregoing, WW acknowledges and agrees that DM's disapproval of WW rendering services in connection with the Other Shows is "reasonable" if DM's New York broadcast partner objects to WW rendering such services. In the event that the current on-air schedule of the Radio Show changes, DM will use commercially reasonable efforts to schedule WW's services around such changed schedule as long as the new schedule does not conflict with the airing of the Series in any market (which airing may be required to be day and date with taping).

           b.     After DM has exercised an Option, WW's services will be subject to WW's current on-air schedule in connection with the Radio Show (i.e., Monday through Friday, 2:00 pm EST to 7:00 pm EST), which DM will schedule around. WW will otherwise be exclusive to the Series in all media until the date that is 6 months after the initial broadcast of the last episode of the Series taped during the final production year of the Series. In the event that the current on-air schedule of the Radio Show changes, DM will use commercially reasonable efforts to schedule WW's services around such changed schedule as long as the new schedule does not conflict with the airing of the Series in any market (which airing may be required to be day and date with taping).

      9.     **Creative Control**: DM will have full creative control with respect to the Series, provided that DM will meaningfully consult with WW with respect to creative issues. For the avoidance of doubt, DM's decisions will control.

      10.     **Other Consultation Rights**: DM will meaningfully consult with WW with respect to the EP/show runner for the Series and employment decisions (i.e., hiring and firing decisions) with respect to the co-EP, booker and head writer of the Series, if any. For the avoidance of doubt, DM's decisions will control.

      11.     **Credit**: Provided that neither Lender nor WW is in default hereof, DM will accord WW the following credits:

       a.     A "Hosted by" credit on all episodes of the Series for which WW renders and fully completes host services.

       b.     An "Executive Producer" credit for WW and for Kevin Hunter on all episodes of the Series for which WW renders and fully completes host services.

     Except as expressly set forth above, all matters regarding the credit to be accorded hereunder shall be determined by DM in its sole discretion. No casual or inadvertent failure by DM to comply with the credit provisions hereof (by reason of shortage of time or otherwise) nor any failure by any third party to comply with such credit provisions shall constitute a breach by DM of this Term Sheet; provided, however, that promptly following DM's actual receipt of written notice in reasonable detail from Lender or WW specifying any material failure by DM to comply with the credit provisions hereunder, DM agrees to use its commercially reasonable efforts to cure prospectively such failure to comply with respect to future prints and/or advertising, as applicable.

   12.    **Key Man**: DM will not have the right to exercise any particular Option hereunder if neither Mort Marcus nor Ira Bernstein is involved with the production or distribution of the Series at the time of such exercise ("**Key Man Requirement**"); provided, however, that the Key Man Requirement will not apply at any time commencing after the date that is 2 years after the initial broadcast of the first episode of the Series produced after the conclusion of the Test Period.

   13.    **Miscellaneous:**

       a.     All services rendered by WW will be rendered on a work-made-for-hire basis for DM, WW hereby waives all rights of droit morale, and Lender and WW assigns to DM all of the results and proceeds of WW's services hereunder. Lender and WW acknowledge and agree that DM or its designee will own all rights in and to the Series and all episodes thereof (and has the right to exploit such rights in perpetuity throughout the universe in all media now known or hereafter devised), DM or its designee will produce all episodes of the Series and DM or its designee will, subject to WW's consultation rights herein, make all decisions regarding the production and exploitation of the Series. Lender and WW acknowledge and agree that nothing herein obligates DM to use WW's services or the results and proceeds thereof in the Series (or any episodes thereof) or to develop, produce, advertise, distribute or otherwise exploit the Series (or any episodes thereof). Lender and WW will execute such further instruments and documents as DM reasonably requests to evidence, effectuate or confirm the provisions of this Term Sheet, and if Lender or WW fails to do so after reasonable notice, then Lender and WW hereby appoint DM as their attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and coupled with an interest) with full power of substitution and delegation. Lender and WW hereby grant DM the right to use and permit others to use WW's name, photograph, likeness, voice and biography and the results and proceeds of WW"s services hereunder in connection with the production, exhibition, advertising, publicity, promotion and other exploitation of the Series, and the exercise of subsidiary, allied and ancillary rights relating to the Series, in perpetuity throughout the universe in any and all media and means now known or hereafter devised. The compensation provided for herein is full and complete consideration for (and neither Lender nor WW will be entitled to further compensation for) all such rights and uses.

       b.     Lender and WW make customary representations and warranties (including, without limitation, that Lender and WW have right to grant the rights granted herein, neither Lender nor WW has or will enter into any commitment or agreement that conflicts in any way with Lender's or WW's obligations hereunder, and the results and proceeds of WW's services are wholly original with WW and will not violate or infringe any rights of any person or entities). Lender and WW will defend and indemnify DM for any third party claims arising out of Lender's or WW's breach or alleged breach of their representations, warranties and agreements in this Term Sheet. Excepting any matters arising out of Lender's or WW's breach or alleged breach of their representations, warranties and agreements of this Term Sheet and any matters arising out of Lender's or WW's negligence or

willful misconduct, DM will defend and indemnify Lender and WW for any third party claims arising out of development, production, distribution or other exploitation of the Series.

        c.     All of DM's payment obligations to Lender hereunder are subject to (i) DM's standard default (which will include breach of a customary morals provision), disability and force majeure provisions and (ii) such deductions and withholdings as may be required by any applicable law.

        d.     WW's services are special, unique, unusual, extraordinary, and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and DM, in the event of any breach by Lender or WW, will be entitled to equitable relief by injunction or otherwise. Lender's and WW's rights and remedies in the event of any breach by DM of the provisions of this Term Sheet will be limited to their right, if any, to recover damages in an action at law, and in no event will Lender or WW be entitled by reason of any such breach to terminate this agreement, or to enjoin or restrain the distribution or other exploitation of the Series, in whole or in part.

        e.     Lender acknowledges that Lender is being engaged on an independent contractor basis hereunder, and Lender agrees to make and assume full responsibility for, and to indemnify DM against, the payment of all taxes, penalties and other similar sums arising out of the foregoing compensation. Because DM has the right to control WW's services and WW is DM's "special employee" for purposes of all applicable workers' compensation laws, the rights and remedies of Lender and WW and/or their heirs, executors, administrators, successors, and assigns shall be governed by and limited to those provided under such workers' compensation statutes if WW should suffer or incur any injury, illness, disability or death arising out of or occurring in the course of WW's special employment pursuant to this Term Sheet.

        f.     WW's consultation rights herein are subject to WW being available as, when and where needed by DM.

        g.     DM may freely assign, delegate or otherwise transfer this Term Sheet and any of its rights or obligations herein (in whole or in part). Neither Lender nor WW may assign, delegate or otherwise transfer their rights or obligations under this agreement. Nothing contained herein will be deemed to constitute a joint venture or partnership between the parties.

        h.     Lender and WW will keep confidential all matters relating to this Term Sheet and the Series. All of DM's obligations hereunder will be subject to (i) WW's ability to prove her employment eligibility, including, without limitation, by completing, signing and delivering to DM a Form I-9 and (ii) WW's continued insurability. Lender and WW acknowledge and agree that the Series will be non-guild unless DM elects otherwise. This Term Sheet is governed by California law and is subject to the exclusive jurisdiction of the state and federal courts located in Los Angeles, California.

    It is intended that a more formal agreement will be entered into by the parties hereto, incorporating the terms and conditions set forth herein and such other terms and DM's standard provisions for transactions of this nature (the **"Long Form Agreement"**). Until the Long Form Agreement is executed by the parties, or if for any reason it is not prepared or executed, this Term Sheet, along with DM's standard terms and conditions which are deemed incorporated herein by reference, will constitute a binding agreement between DM, on the one hand, and Lender and WW, on the other hand, and will supersede any and all prior communications with respect hereto and may not be modified except by a written instrument(s) signed by the parties.

    The foregoing is agreed to and accepted as of the date first written above.

31399756

Very truly yours,

Debmar/Mercury, LLC

By: _____

Its: _____

ACCEPTED AND AGREED:

Wendy, Inc.

By: _____

Its: _____

I have read the foregoing Term Sheet and consent to the execution thereof and hereby join in, ratify and confirm all acknowledgments, representations, warranties, consents, and agreements of Wendy, Inc. ("Lender") contained therein. Without limiting the generality of the foregoing, I hereby confirm that Lender has the full right and authority to grant all rights granted in the foregoing letter agreement, and I hereby agree to be bound by all of the terms thereof and to render all services required of me pursuant thereto whether or not Lender performs its obligations under its employment contract with me and whether or not such contract remains in effect and whether or not Lender or its successors in interest should be dissolved, become insolvent or cease to exist or for any other reason whatsoever (including without limitation entering into any type of bankruptcy or similar proceeding) fail, be unable or refuse to perform and observe any or all of the conditions of the foregoing letter agreement requiring performance or compliance on its part. I further agree to look solely to Lender for any and all compensation to which I may be entitled by reason of the foregoing letter agreement or any services rendered by me pursuant thereto. Finally, I hereby guarantee full performance by Lender of all terms of the foregoing letter agreement and agree that under said letter agreement, Debmar/Mercury, LLC may proceed directly against me, in the event of any breach or default under said Term Sheet, as though I were a direct party thereto.

_____
Wendy Williams

# EXHIBIT B

Fw: Wendy Williams

Date:  Wednesday, December 21, 2011, 11:00 AM EST

Sent from my Verizon Wireless BlackBerry

**From:** "Stephen D. Barnes"
**Date:** Tue, 20 Dec 2011 14:36:59 -0800
**To:** Jill Ramsey
**Subject:** Wendy Williams

Hello Jill,

I really enjoyed meeting Kevin and discussing Wendy's upcoming renegotitaion. I have a few thoughts I wanted to share with you.

I could tell that Kevin wants to maintain the good and productive releationship he has with Mort and Ira and that is perfectly understandable and appropriate. I know it is tough to entrust someone relatively new to navigate a signifiant negotiation with the care and sensitivity necessary to accomplish the objectives but not damage the underlying relationships. While I have successfully negotiated many deals, since Kevin doesn't yet know me he doesn't have the experience with me to know that successful negotiations always involve balancing the deal terms and personal business relationships. The right tone has to be struck and that dynamic changes througout the process.

My goal would be to change for Wendy's and Kevin's benefit the tone and nature of their dealings with Mort and Ira, while preserving the strong working relationship that has developed over the past few years. As I mentioned, no matter how strong the friendships have become, if it were not profitable for Mort and Ira, they woudn't hesitate to move on and that is fully expected. Likewise, the relationship will not fall because Wendy and Kevin seek a renegotiated deal that maximizes Wendy's value. A happy medium will be struck. I don't negotiate with just one approach or tone and the goal always remains the same: make a new deal that satisfies the client and works.

While I am speculating about Wendy's contract, it likely lacks in several key respects: amount of guaranteed compensation; backend participation; term; creative control and rights.  A new deal will address these areas. Since the initial term was for 5 years, the new term shouln't exceed that amount of time. I know the range of money, number of weeks per year Wendy should work, backend participation and rights Wendy should have. While we didn't get into the specifics today, I'm happy to lay that information out. In addition, it occurs to me that a new company should be set up by Kevin and Wendy to seek out and handle product integration and branding through which integration deals should be made for Wendy's participation on the show. It can also be used to perform the same services for other shows. Once Kevin reaches out to prospective sponsors he can and should "introduce" such sponsors to other shows for a fee. I can tell Kevin is very aggressive and can build himself quite  business in this area. It also allows Wendy and Kevin a way to participate in intetgration indirectly since a fee is the way most pay for integration/branding services. He can take his fee off the top. In addition, several other viable business opportunities crossed my mind during the meeting. Wendy and Kevin should consider producing a Broadway Hip Hop musical or play. I have a fuller idea about it but wanted to mention it now. We should also explore the setting up of an "urban" QVC network with QVC. That would be worth a ton of money and no one's ever done that before. Lastly, Wendy should have a first look producing deal with Lionsgate to develop television and feature projects. It is Lionsgate that is behind Wendy and

finances the show. It has the most to gain from broadening the relationship with her and cross promoting her in their films and television shows. As I mentioned, I recently spoke to the Chairman and Co-Presdent of Lionsgate about her and they love her.

Anyway, assuming I will be handling the renegotiation, I would send you and Kevin a written proposal of deal terms to be addressed. I would then discuss it with you two and get any comments or feedback you might have. Then, I would finalize the proposal and submit it to Mort and Ira. In order to best preserve the good relationship Kevin has with them, I would caution against his discussing the negotiation with them even though it's likely they'll bring it up. I'd prefer Kevin to say that he hired me to handle it and would prefer they communicate with me about it. That avoids any expectation on their part that Kevin will make decisions before the negotiation has identified the key unresolved issues. What's I've seen happen more times than not is the people on the other side trying to influence the outcome of the negotiations instead of addressing the issues on the table. The more Mort and Ira believe they can go around me, the more likely they will try to do so, which will only delay a resolution and make more difficult closing the deal.

Kevin is a smart and interesting guy and has positioned Wendy brilliantly. This new deal will set her up for the future, putting her destiny more in her hands than before. She has film, television and other creative opportunities ahead of her and this is a perfect time to set the stage for the branding of her and her production company and in sharing the creative vision of her show.

Let's talk soon. I will be drafting the proposal for further discussion.

Best to you and Happy Holidays!

Stephen

11/12/19, 8:47 PM

EXHIBIT C

## RE: RE: Kevin Hunter/DebMar Mercury Commission

From: Karrie Komaru █████████████████████████

To: █████████████████████████

Date: Wednesday, October 24, 2012, 6:17 PM EDT

FYI…the commission check was sent today, by Fed Ex.

It is addressed to you and sent to the Wendy Williams Studio.  You should receive it tomorrow.

**Karrie Komaru**

**Controller**

**Debmar Mercury LLC**

████████████████

████████████████

████████████████████

**From:** Kevin Hunter ██████████████████████████████

**Sent:** Monday, October 22, 2012 3:56 PM

**To:** Karrie Komaru

**Subject:** Re: RE: Kevin Hunter /DebMar Mercury Commission

Cool....thx

Sent from Yahoo! Mail on Android

**From:** Karrie Komaru <█████████████████████>;

**To:** Kevin Hunter ██████████████████████

**Cc:** Liz Koman ██████████████████████████████████████

████████████████████████

**Subject:** RE: Kevin Hunter /DebMar Mercury Commission

**Sent:** Mon, Oct 22, 2012 10:20:51 PM

Hi Kevin,

Thank you for the information.

Payment for the commission due has been submitted for processing and scheduled for the next few days.

I will let you know when the payment is sent.

Thanks,

**Karrie Komaru**

**Controller**

**Debmar Mercury LLC**

███████████

████████████

██████████████████

---

**From:** Kevin Hunter [mailto:████████████████████
**Sent:** Monday, October 22, 2012 8:46 AM
**To:** Karrie Komaru
**Cc:** Liz Koman ; ██████████████████████████
**Subject:** Kevin Hunter /DebMar Mercury Commission

Hi Karrie-

Please let this serve as notice that my agreement with DebMar Mercury in connection with integrations that I bring to The Wendy Williams Show is the following:

- 53rd West Management, Inc. will received a 10% commission on all integrations brought by Kevin Hunter , minus net costs.

2 of 3                                                                      11/12/19, 9:06 PM

Best,


Kevin Hunter

# EXHIBIT D



**DEBMAR-MERCURY**

<u>**VIA TELEPHONE AND HAND DELIVERY:**</u>

Mr. Kelvin Hunter



Dear Kevin:

Out of respect for our 10-year working relationship, we had hoped to meet with you in person and traveled to New York to do so, but unfortunately, you have cancelled today's meeting and we are left with no choice but to communicate to you in writing that effective immediately, your role as an Executive Producer of the Wendy Williams Show is terminated, and your professional relationship with Debmar-Mercury is also concluded.

In connection with the termination of your employment, you are no longer permitted on the studio premises and all communication regarding your transition (including collection of your belongings from the studio premises) should be handled via your attorney as you have indicated that you are represented by counsel. Your attorney may reach out to either of us directly so we can direct him/her to the appropriate parties.

Thank you for all of your contributions over the years, Kevin. We wish you well.

Ira Bernstein & Mort Marcus
Co-Presidents, Debmar-Mercury

# EXHIBIT E



# yahoo! mail

debmar

Kevin Hunter    Account Info    Go    Sign Out    Home

Inbox | Contacts | Notepad | Calendar

Compose

**questionmarke…** 999+
**hunterkevinwend…** 999+

Inbox 999+
Drafts 213
Sent
Archive
Spam
Trash

Folders    Edit  Hide
+ New folder
Brie from Oxygen 7
DOODLE for HUNGER
INTERVIEW REQUESTS
Junk
MTV Allison Kim 4
NIKE 20
Notes
PPG - ONE of ONE 3
Queen of All Media
QUEEN PEN
SNEAKERKONG 17
Unwanted
Wendy Stuff 10
Wendy TV 5

Back to Search    Delete    Spam    Actions    Apply

## Re: [SPAM] Re: Logo

questionmarkent…/Inbox

DP

Sep 2, 2011 at 12:12 PM

Print  Raw message

**David Perler**
To: Lonnie Burstein
Alexandra Jewett
Chris Strand
Cc: Pam Smith                    ,
Kevin Hunter                     ,
Matt Uzzle                       ,
Adam Lewis

Kevin liked it.  I think the wendy williams show will still be playful. Every element of the show does not need to be playful

**From:** Lonnie Burstein <                    >
**Date:** Fri, 2 Sep 2011 11:53:20 -0400
**To:** Alexandra Jewett                              , Pam Smith                    , Kevin
Hunter                              , Matt Uzzle                              , Adam
Lewis                              
**Subject:** RE: [SPAM] Re: Logo

I'm not so sure…it looks sturdy to me, very strong, and loses the playfulness that is TWWS. Going back 3 years ago, Wendy/Kevin didn't want the show to be known as WENDY, hence TWWS in all logo treatments. Would like to hear their feedback on the prominence of Wendy…..three years later it might be more appropriate.

Is there anything else to look at?

**From:** Alexandra Jewett
**Sent:** Friday, September 02, 2011 8:49 AM
**To:** Chris Strand
**Cc:** D Perler; Lonnie Burstein; Pam Smith; Kevin Hunter; Matt Uzzle; adam lewis
**Subject:** Re: [SPAM] Re: Logo

Got it – thanks. I like it. I like the pink and purple combo of the third one. The all pink seems very 'young' to me and since we are 'growing up' I like less all pink. I think the black is too harsh – but as mentioned I like the treatment a lot.

On 9/2/11 11:40 AM, "Chris Strand" <                    > wrote:
It's not a progression, just various color treatments of the same logo.
The main idea was to re-do the logo featuring "Wendy" as prominently as possible, making "The Wendy Williams Show" secondary in importance.

> Am a little confused. I see  black logo…pink…and pink on black. Is that
> a progression? I do like the font and TWWS treatment in the Y  looks
> clean
> and sophisticated. But I am looking at 3 different treatments…?
>
>
> On 9/2/11 11:19 AM, "David Perler" <                    > wrote:
>
>> Hi all.  Here is the new logo we like for season 3. Please sign off or
>> give

>> notes asap so we can move forward.
>>
>> ------ Forwarded Message
>> From: Chris Strand <​▓▓▓▓▓▓▓▓▓▓​>
>> Date: Wed, 31 Aug 2011 17:51:04 -0400
>> To: David Perler <​▓▓▓▓▓▓▓▓▓▓​>
>> Subject: Re: Logo
>>
>>
>>
>> ------ End of Forwarded Message
>>


--
Alexandra Jewett
Sr. VP, Programming & Production
Debmar-Mercury



Compose

↩  ↩↩  ➡            ▬ Delete    🛡 Spam    Actions⌄    Apply

# EXHIBIT F

**WENDY, INC.**

To:     Mort Marcus & Ira Bernstein
From:  Kevin Hunter
CC:     Wendy Hunter
Date:   January 9, 2012
Re:      Negotiation of Wendy Williams Contract Terms w/DebMar Mercury
_____

Dear Mort and Ira:

Below please find our proposed deal terms with respect to entering into a new agreement with DebMar Mercury.  Upon review, please contact me to discuss.

1. **Term**-      2 remaining contract years (Years 4-5), with 2 additional contract years (Years 6-7).

2. **Fees**-



   Signing Bonus-  $█████  to be paid immediately.

   Year 4 -   $████████████e paid Jan. 1, 2013-█████-
THIS NUMBER IS THE ORIGINAL CONTRACT FEE.
   Year 5-  $████████up from $███████
   Year 6-  $████████
   Year 7-  $████████

   Bonus Structure

   1.5 Share    $████
   1.7 Share    $████
   2.0 Share    $████

   THE ABOVE BONUS STRUCTRUE IS OUT.  If the show get a consistent, 1.4, the total compensation will be as follows:

   Year 4-  ████
   Year 5-  ████
   Year 6-  ████
   Year 7-  ████

3. **Back-End Participation**  - The formula should be changed from the current "net" to a MAGR (modified adjusted gross receipts) backend, the definition of which will be fully negotiated. The increased backend should apply to the upcoming year as well as the new term.

They agreed to switch to MAGR but the distribution fees should be reduced as follows:

ALL DISTRIBUTION FEES SHALL BE REDUCED BY 10% however, merchandising should be reduced from 40% to 25%.

4. **Ancillary Income**- WW should receive 15% of product integration fees and ancillary exploitation from the series, including but not limited to merchandising and music income.

WE AGREED TO THIS.

1

5. **Exclusivity**- Wendy Williams should be exclusive in network television only. All other activities should be in WW's control and reserved to her, subject only to her talk show obligations. The reserved rights should include social networking, radio, film, cable, etc.

THEY ONLY WANT TO GIVE US FILM but we want CABLE and RADIO as well.

6. **Credit**- WW should have a production company credit added to the current credits..

We agreed to this.

7. **Creative Control**- WW should have mutual approval of the showrunner and other key elements of the show.

We agreed but they have the final say.

8. **Miscellaneous**- There should be cooperation and tie-in to other WW activities, such as live appearances, including QVC.

There is no mention of this but the idea is that you have a certain "bank" for mentions as in the one we created at WBLS.

OTHER POINTS:

A: Security in case the series is cancelled before the end of the season.
B. First Negotiation/Last Refusal Rights- We agreed to this ONLY if DebMar exercises all of its options.

# EXHIBIT G

## Re: Paystubs

From:  Jacqueline Anderson ████████████████

To:    awoleck████████        Lori.schiller ████████

Cc:    gpress████████  ;  ████████████████

Date:  Wednesday, November 16, 2016, 3:39 PM EST

Hi Abbey & Lori,

Attached is what I received from our Executive In Charge of Production, Matt Uzzle.  It is an A/P report detailing the last two payments to Kevin's company.
Regarding Kevin, Matt said:
"He's not on payroll.  He's paid via accounts payable through his Inc.   53rd Mgmt Inc is a corporate entity therefore there is no W2 or 1099."

Kevin also informed me he was not including any documents regarding Wendy.
I hope the attachment helps.

Thanks!
JSA


**Jacqueline Anderson**
**Executive Assistant To Talent & Executive Producer**
████████████████████████
████████████████


---

**From:** Abbey Wolecki <awoleck████████>
**Date:** Wednesday, November 16, 2016 at 9:18 AM
**To:** Jacqueline Anderson <janderson████████>
**Subject:** Paystubs


Hi Jacqueline,


Can you please help me obtain the following items for Lori Schiller (the investment advisor):


1- 2014 Wendy Inc W-2 for Wendy

2-2 of the most recent pay stubs for Wendy from Wendy Inc?

3- 53rd West Management W-2 for 2014 for Kevin

Thanks,

Abbey Wolecki

Sacks, Press & Lacher



To ensure compliance with requirements imposed by the IRS, we inform you that unless specifically indicated otherwise, any tax advice contained in this communication (including any attachment to this communication, other than an attachment which is a formal tax opinion) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

CONFIDENTIAL!

This electronic message and any attachments to it may contain information that is legally confidential.  This information is intended only for the individual or entity named above and is not to be disclosed or distributed any further.  Access by any other party is prohibited. If you are not the intended recipient any disclosure, copying, distribution or use of the contents of this message or attachments is strictly prohibited and could be a violation of law.  If you have received any of this information in error, please notify the sender immediately and delete or destroy this message and/or attachments.

 Kevin Hunter 53rd West.pdf
54.7kB

# EXHIBIT H



DocuSign.com — DocuSign® Official Site — Most Trusted — Ad

**Re: Jill Ramsey**

questionmarkent.../Sent

Kevin Hunter
To: Lonnie Burstein

Aug 21, 2009 at 9:55 PM

Print    Raw message

OK and I'll call Jill

--- On **Fri, 8/21/09, Lonnie Burstein** <                    > wrote:

> From: Lonnie Burstein <                    >
> Subject: Jill Ramsey
> To: "Wendy Williams" <                    >, "Pamela Blake" <                    >
> Cc: "Miller, Lauren" <
> Date: Friday, August 21, 2009, 10:56 PM
>
> Pam,
>
> Can you please let Kevin know that Jill is once again not getting back to our attorneys who
> want to go over her notes on the contract amendment. This potentially can cost us significant
> dollars if I don't get the amendment signed promptly.
>
> Lonnie
>
> Lonnie Burstein
> Executive Vice-President Programming
> Debmar Mercury