# EXHIBIT A

## PROPOSED FIRST AMENDED COMPLAINT

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

KELVIN HUNTER,

Plaintiff,

-against-

DEBMAR-MERCURY LLC, IRA BERNSTEIN, MORT MARCUS, and JOHN and JANE DOE 1-5 (Employees of Defendant DEBMAR-MERCURY LLC, and/or corporations/subsidiaries of DEBMAR-MERCURY LLC not yet known),

Defendants.

22 Civ. 1687 (PGG)

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Kelvin Hunter, also known as Kevin Hunter ("Hunter"), proceeding pro se, alleges as follows against Defendants Debmar-Mercury LLC ("Debmar"), Ira Bernstein, Mort Marcus, and John and Jane Doe 1 through 5:

## NATURE OF THE ACTION

1. In October 2012, Hunter wrote to Debmar's Controller to confirm "my agreement with DebMar Mercury": a 10% commission "on all integrations brought by Kevin Hunter, minus net costs." The Controller confirmed payment the same day and sent the check "addressed to you." For the next six years, Debmar paid Hunter those commissions every quarter.

2. Debmar also paid Hunter his one-half share of the 15% participation in integration fees that Debmar had agreed to pay on the host side of The Wendy Williams Show (the "Show"). It paid that share by checks made out to Hunter individually, separate from the checks it issued to Ms. Williams. And it credited Hunter on every episode as an Executive Producer, as its 2007 Term Sheet for the Show promised him by name.

3. Debmar separately agreed to compensate Hunter for his Executive Producer services and made recurring payments through his designated payee, 53rd West Management, Inc. Debmar's accounting records expressly identify monthly Executive Producer fees of $33,333.33 in October and November 2016.

4. On April 18, 2019, one week after Ms. Williams filed for divorce, Debmar ended Hunter's role "effective immediately," stating no cause. The integrations Hunter had brought kept running and kept paying Debmar. Debmar stopped paying Hunter's commissions and participation, ceased his Executive Producer fee payments after approximately one additional month, and later removed his name from the screen while Ms. Williams was still hosting.

5. Hunter seeks the commissions, participation payments, Executive Producer compensation, and other relief that Debmar agreed to pay him and still owes.

**THE PARTIES**

6. Hunter is a natural person. When this action was filed on March 1, 2022, he was domiciled in, and a citizen of, the State of New Jersey. He also lived in New Jersey in 2019 and 2020. He now resides in Broward County, Florida.

7. Debmar is a California limited liability company with its principal place of business in Santa Monica, California. It maintained an office in New York, New York, from which it produced the Show.

8. Defendant Ira Bernstein ("Bernstein") is a natural person. He is a co-president of Debmar and one of its two members. On March 1, 2022, he was domiciled in, and a citizen of, the State of California.

9. Defendant Mort Marcus ("Marcus") is a natural person. He is a co-president of Debmar and one of its two members. On March 1, 2022, he was domiciled in, and a citizen of, the State of California.

10. Defendants John and Jane Doe 1 through 5 are employees of Debmar, and/or corporations or subsidiaries of Debmar, whose names are not yet known to Hunter. Hunter will amend this pleading to state their true names when they are ascertained.

11. On March 1, 2022, Debmar's members were Ira Bernstein and Mort Marcus, each a citizen of California, as Debmar has identified to the Court (**Dkt. No. 39**). No member of Debmar, and no named Defendant, was a citizen of the State in which Hunter was domiciled.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). The parties are citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Venue is proper under 28 U.S.C. § 1391(b)(2). The Show was produced and taped in Manhattan, and a substantial part of the events giving rise to these claims occurred in this District.

## FACTS

### A. The Show and the 2007 Term Sheet

14. Debmar produced and distributed the Show, a nationally syndicated daytime talk show hosted by Wendy Williams. The Show was taped in Manhattan and aired from 2008 to 2022.

15. On November 5, 2007, Debmar (named in the document as "Debmar/Mercury, LLC") and Wendy, Inc., the company that furnished Ms. Williams's services, entered into a written

Term Sheet for her services as host of the Show (the "Term Sheet"). The Term Sheet states that it is binding. A copy is attached as **Exhibit 1**.

16. Hunter negotiated the Term Sheet and signed it as an officer of Wendy, Inc. He was then married to Ms. Williams and served as her manager.

17. Paragraph 11(b) of the Term Sheet provides that Debmar "will accord" "[a]n 'Executive Producer' credit for WW and for Kevin Hunter on all episodes of the Series for which WW renders and fully completes host services."

18. Hunter is the "Kevin Hunter" named in paragraph 11(b). Apart from Ms. Williams, he is the only person to whom the Term Sheet promises any credit.

19. The Term Sheet gave Debmar options to extend Ms. Williams's services by production year. On information and belief, Debmar exercised those options, and paragraph 11(b) was carried forward in the later agreements under which the Show was produced. Those include an agreement dated September 14, 2015 between Wendy, Inc. and Talk WW Productions, Inc. ("Talk WW"), which that agreement identifies as the Show's producer, as amended in or about September 2018 and on October 31, 2019. On information and belief, Talk WW is an affiliate of Debmar through which Debmar produced the Show, and Debmar remained bound by, and continued to perform, paragraph 11(b). Hunter does not have the September 14, 2015 agreement; Debmar does. On information and belief, no later agreement removed or changed paragraph 11(b). Debmar continued to accord Hunter the credit on every episode into 2020, more than a year after it ended his role.

20. Debmar accorded Hunter an Executive Producer credit on the Show's episodes continuously from the Show's first season until on or about April 15, 2020.

**B. Hunter's Role and Debmar's Direct Dealings with Him**

21. Hunter served as an Executive Producer of the Show from its launch until April 18, 2019. He helped develop the Show's format and segments, approved guests and musical performers, built relationships with record labels and brands, hired production staff, and was the principal liaison between Ms. Williams and Debmar's co-presidents, Ira Bernstein and Mort Marcus.

22. Debmar negotiated Hunter's compensation with him directly. In a December 20, 2011 email, Mr. Marcus set out Debmar's offer season by season, with a separate figure for Hunter beside Ms. Williams's, rising each season through season eight. A copy is attached as **Exhibit 2**.

23. At Hunter's direction, Debmar paid his producer compensation to his company, 53rd West Management, Inc. ("53rd West"), through the Show's accounts payable system. In a November 16, 2016 email, the Show's Executive in Charge of Production confirmed that Hunter was "paid via accounts payable through his Inc. 53rd Mgmt Inc." A copy is attached as **Exhibit 3**.

24. Debmar's accounting records independently document these payments. A November 16, 2016 A/P Vendor Analysis for the Show identifies 53rd West as Vendor No. 000518 and records a $33,333.33 payment described as "EP FEES-OCTOBER 2016," check No. 017577, dated October 1, 2016, and a $33,333.33 payment described as "EP FEE-NOVEMBER 2016," check No. 017761, dated October 26, 2016. Both entries are designated "Paid." A copy is attached as **Exhibit 8**.

25. Those accounting entries establish recurring Executive Producer fee payments of $33,333.33 monthly in the documented period, equivalent to approximately $400,000 annually at that rate. These fees were distinct from Hunter's integration commissions and participation payments.

26. 53rd West was wholly owned by Hunter and served only as the payee he designated. 53rd West had no agreement of its own with Debmar and performed no services for Debmar. 53rd West, incorporated in Fort Lee, New Jersey, is currently inactive. Every service for which Debmar paid was performed by Hunter personally.

27. Hunter rendered his services as Executive Producer under a contractual compensation arrangement with Debmar, not as an at-will employee. The Term Sheet's credit provision, Debmar's direct compensation communications, its recurring fee payments, and the parties' course of dealing from 2008 through April 2019 evidence that arrangement.

28. Debmar tied Hunter's Executive Producer engagement and compensation to Ms. Williams's hosting of the Show. Paragraph 11(b) of the Term Sheet promised Hunter an Executive Producer credit on every episode for which Ms. Williams rendered and fully completed host services(Exhibit 1). Debmar set Hunter's compensation season by season, beside Ms. Williams's fee for the same season (Exhibit 2). Consistent with that arrangement, Debmar paid Hunter his Executive Producer fees for every season in which Ms. Williams hosted the Show, from 2008 until April 2019. Hunter's engagement and compensation were therefore to continue for as long as Ms. Williams hosted the Show.

29. By 2019, Debmar was paying Hunter approximately $450,000 per year for his services as Executive Producer.

## C. Agreement for Commissions

30. A "product integration" is a paid arrangement in which a brand's product or service is featured within an episode. Brands paid Debmar fees for integrations on the Show.

31. Debmar agreed to pay Hunter a commission on each integration he brought to the Show, whether he arranged the integration himself or brought the brand to Debmar.

32. On October 22, 2012, Hunter wrote to Debmar's Controller, Karrie Komaru, copying Debmar's Liz Koman, to confirm that "my agreement with DebMar Mercury in connection with integrations that I bring to The Wendy Williams Show is the following: 53rd West Management, Inc. will receive[] a 10% commission on all integrations brought by Kevin Hunter, minus net costs" (the "Commission Agreement"). A copy is attached as **Exhibit 4**.

33. The same day, Ms. Komaru replied that "[p]ayment for the commission due has been submitted for processing." On October 24, 2012, she wrote that "the commission check was sent today, by Fed Ex. It is addressed to you." Copies of these emails are attached as **Exhibit 5**.

34. Debmar never objected to or disputed the terms Hunter stated. It paid under them.

35. The agreement for commissions contains no end date and no term ending Hunter's right to commissions on integrations he brought. Debmar also agreed that commissions on integrations Hunter brought would continue to be paid after his engagement ended.

36. Hunter brought integrations and brand partnerships to the Show, including with Walmart, Office Depot, CVS, Walgreens, RadioShack, Dollar Tree, The Cheesecake Factory, Serendipity, QVC, HSN, NUVO, and Brabble, and he co-produced on-air and in-field activations for several of them such as Dollar Tree, Office Depot, NUVO, and Burlington Coat Factory from approximately 2011 through and including 2016.

37. From 2012 until early 2019, Debmar paid Hunter's commissions every quarter, by check, with remittance statements identifying the integrations and the commission paid on each. Debmar made its last commission payment in or about the first quarter of 2019.

## D. Hunter's Share of the Integration Participation

38. In January 2012, Debmar agreed that the host side of the Show would receive 15% of product integration fees and ancillary exploitation revenue from the Show. A January 9, 2012

memorandum to Mr. Marcus and Mr. Bernstein records that term with the notation "WE AGREED TO THIS." A copy is attached as **Exhibit 6**.

39. Debmar did not pay that 15% in a single amount. From 2012 until April 2019, Debmar itself divided it equally between Ms. Williams and Hunter and paid each of them separately: one half by check made out to Ms. Williams, and the other half by check made out to Hunter individually.

40. Debmar paid Hunter his half every quarter, on every integration on the Show, whether or not Hunter had brought it. These payments were in addition to his 10% commission.

41. By paying Hunter his half directly, in his own name, every quarter for seven years, Debmar agreed to pay Hunter his share of the participation as an obligation owed to Hunter himself.

## E. The Termination

42. On April 11, 2019, Ms. Williams filed for divorce.

43. On April 18, 2019, Mr. Bernstein and Mr. Marcus, as Co-Presidents of Debmar, informed Hunter in writing that "effective immediately, your role as Executive Producer of the Wendy Williams Show is terminated, and your professional relationship with Debmar-Mercury is also concluded." The notice stated no cause. It identified no performance, conduct, or workplace issue, and none existed. A copy is attached as **Exhibit 7**.

44. When Debmar ended Hunter's role, integrations Hunter had brought were already under contract and paying Debmar. On information and belief, Debmar ended Hunter's role effective immediately, without notice, in order to stop paying him commissions and participation shares on those integrations.

45. After April 18, 2019, Debmar paid Hunter one final month of his Executive Producer fee and nothing more.

**F. Unpaid Executive Producer Fees**

46. Before April 18, 2019, Debmar regularly paid Hunter compensation for his Executive Producer services, including the monthly fees reflected in the 2016 accounting records. These payments were separate from Hunter's integration commissions and his share of the 15% participation.

47. After approximately one additional month of Executive Producer compensation following the April 18, 2019 termination notice, Debmar ceased paying Hunter's Executive Producer fees.

48. Hunter alleges that the parties' compensation arrangement obligated Debmar to pay the Executive Producer compensation due for the remaining applicable contractual term and that Debmar's unilateral termination did not extinguish that obligation.

49. Debmar did not identify a contractual basis for withholding the remaining compensation or provide Hunter with an accounting of the Executive Producer fees accrued, paid, or withheld after his termination.

50. The unpaid Executive Producer compensation is separate from, and additional to, Hunter's unpaid integration commissions and participation payments. Its amount is ascertainable from the governing agreements and Debmar's compensation and accounts payable records.

**G. Debmar's Breaches**

51. Integrations that Hunter had brought, including integrations with brands identified in paragraph 36, on information and belief continued to run after April 18, 2019, and on information and belief Debmar continued to collect fees.

52. Debmar has paid Hunter no commission on any of those fees.

53. Debmar continued to collect integration fees on the Show after April 18, 2019. It has paid Hunter no part of his share of the 15% participation for any period after April 18, 2019. On information and belief, Debmar retained the share it had paid to Hunter rather than paying it to anyone else.

54. Ms. Williams continued to render and fully complete host services on episodes of the Show until in or about June 2022. Debmar removed Hunter's Executive Producer credit from the Show in or about 2019 and did not accord it on later episodes that Ms. Williams fully hosted.

55. Debmar has not paid Hunter the Executive Producer compensation due for the remainder of the term, which continued until Ms. Williams stopped hosting the Show in or about July 2021.

56. Debmar has never given Hunter any statement of the integration fees it collected after April 18, 2019. The identity of each integration that continued, its dates, and the fees Debmar received for it are recorded in Debmar's books and are known only to Debmar. Based on the payments Debmar made to him before April 2019, the amounts Debmar owes Hunter exceed $75,000.

57. All conditions precedent to Debmar's obligations to Hunter have been performed or have occurred.

## H. Bernstein's and Marcus's Control of Debmar

58. At all relevant times, Bernstein and Marcus were Debmar's only members and its co-presidents. They formed Debmar, ran its day-to-day affairs, and made its final decisions on the Show's staffing and on the compensation of the Show's producers.

59. Bernstein and Marcus dealt with Hunter personally on every term at issue. Marcus set out Hunter's compensation in the December 20, 2011 email (**Exhibit 2**). The January 9, 2012 memorandum recording the 15% participation was addressed to Marcus and Bernstein and records their agreement (**Exhibit 6**).

60. Bernstein and Marcus personally decided to end Hunter's role, and they signed the April 18, 2019 notice as Co-Presidents (**Exhibit 7**).

61. Bernstein and Marcus also personally decided, and directed Debmar's personnel, that Debmar would stop paying Hunter his commissions, his share of the participation, and his Executive Producer compensation after April 18, 2019, while Debmar continued to collect the integration fees on which those payments were based.

62. On information and belief, no officer, member, or manager of Debmar other than Bernstein and Marcus took part in, or had authority to override, those decisions. In deciding to end Hunter's role and to stop paying him, Bernstein and Marcus exercised complete domination over Debmar with respect to those transactions.

63. Bernstein and Marcus used that domination to commit a wrong against Hunter. They ended Hunter's role effective immediately, one week after Ms. Williams filed for divorce and without stating any cause, in order to cut off the payments Debmar owed him on integrations that were already under contract, and they caused Debmar to keep the fees and the participation share that belonged to Hunter.

64. On information and belief, Bernstein and Marcus, as Debmar's only members, received the benefit of the commissions, participation share, and Executive Producer compensation that Debmar withheld from Hunter, through distributions of Debmar's profits or otherwise.

65. Hunter was injured as a result. He has not been paid the commissions, participation share, and Executive Producer compensation alleged above.

66. Bernstein and Marcus are liable, together with Debmar, for each of Debmar's obligations to Hunter alleged in this First Amended Complaint.

**FIRST CAUSE OF ACTION**
(Breach of Contract: The Commission Agreement)
(Against Debmar, Bernstein, and Marcus)

67. Hunter repeats paragraphs 1 through 66.

68. Hunter and Debmar entered into the Commission Agreement. Debmar agreed to pay Hunter a 10% commission, net of costs, on all integrations brought by Hunter, payable to the payee Hunter designated. Debmar's Controller confirmed the agreement in writing, and Debmar performed it for more than six years.

69. Under the Commission Agreement, Hunter earned his commission on an integration when he brought it to the Show and the brand contracted with Debmar for it. Debmar's later receipt of each fee fixed the amount and the time of payment, not whether the commission had been earned.

70. Hunter performed. He brought integrations to the Show, and Debmar received fees for them.

71. Debmar breached the Commission Agreement by failing to pay commissions on fees it received after April 18, 2019 for integrations Hunter brought.

72. Hunter has been damaged in an amount to be determined at trial, plus interest.

**SECOND CAUSE OF ACTION**
(Breach of the Implied Covenant of Good Faith and Fair Dealing: The Commission Agreement)
(Against Debmar, Bernstein, and Marcus)

73. Hunter repeats paragraphs 1 through 66. This cause of action is pleaded in the alternative to the First Cause of Action, to the extent Debmar contends that its obligation to pay commissions ended with Hunter's role.

74. Implied in the Commission Agreement is Debmar's promise that it would not act to deprive Hunter of the commissions he earned by bringing integrations to the Show.

75. Debmar alone controlled whether and when Hunter's engagement ended, the collection of integration fees, the preparation of remittance statements, and the timing of commission payments.

76. Debmar breached that covenant. It ended Hunter's role effective immediately, while integrations he had brought were under contract and paying Debmar, in order to stop paying his commissions on them, and it then kept the fees.

77. Hunter has been damaged, including by the loss of the commissions on integrations he brought, in an amount to be determined at trial, plus interest.

**THIRD CAUSE OF ACTION**
(Breach of Contract: Hunter's Share of the Integration Participation)
(Against Debmar, Bernstein, and Marcus)

78. Hunter repeats paragraphs 1 through 66.

79. From 2012 until April 2019, Debmar agreed, through its course of dealing with Hunter, to pay Hunter directly one half of the 15% participation on all integration fees and ancillary exploitation revenue the Show received, every quarter, by check made out to Hunter individually.

80. Debmar received integration fees and ancillary exploitation revenue after April 18, 2019 and has paid Hunter none of his share for any period after that date.

81. Hunter has been damaged in an amount to be determined at trial, plus interest.

**FOURTH CAUSE OF ACTION**
(Breach of Contract: Executive Producer Credit, as Third-Party Beneficiary)
(Against Debmar, Bernstein, and Marcus)

82. Hunter repeats paragraphs 1 through 66.

83. The Term Sheet, as extended and carried forward in the agreements identified in paragraph 19, is a valid and binding contract between Debmar, directly or through Talk WW, and Wendy, Inc.

84. Paragraph 11(b) names Hunter and promises him an Executive Producer credit in his own name. The contracting parties intended that credit to benefit Hunter directly, and the benefit runs to Hunter alone. Debmar performed paragraph 11(b) for Hunter for more than a decade.

85. Debmar breached paragraph 11(b) by removing Hunter's Executive Producer credit from episodes that Ms. Williams fully hosted after in or about 2020.

86. Hunter has been damaged, including by the loss of the professional and reputational value of an on-screen Executive Producer credit on a nationally syndicated program and the opportunities that credit brings, in an amount to be determined at trial, and at a minimum is entitled to nominal damages.

**FIFTH CAUSE OF ACTION**
(Breach of Contract: Executive Producer Compensation)
(Against Debmar, Bernstein, and Marcus)

87. Hunter repeats paragraphs 1 through 66.

88. Hunter and Debmar entered into a contractual arrangement under which Hunter would perform Executive Producer services on the Show and receive agreed compensation for

those services. That arrangement is evidenced by Debmar's direct compensation communications, the parties' course of dealing, and Debmar's recurring payments to Hunter's designated payee.

89. The November 5, 2007 Term Sheet expressly identified Hunter as an Executive Producer; the December 20, 2011 compensation correspondence separately identified compensation for Hunter; and the Show's accounts payable records confirm monthly Executive Producer fee payments of $33,333.33 in October and November 2016. By 2019, Debmar was paying Hunter approximately $450,000 annually for his Executive Producer services.

90. Hunter performed his contractual obligations until Debmar terminated his engagement on April 18, 2019.

91. Hunter's engagement and compensation were to continue for as long as Ms. Williams rendered host services on the Show, which she did until in or about July 2021. Debmar ended Hunter's engagement on April 18, 2019 more than two years before that term ended, without stating any cause and without identifying any contractual basis for doing so.

92. Debmar breached its compensation obligations by ceasing payment of Hunter's Executive Producer fees after approximately May 2019 and failing to pay the compensation due for the rest of the term, through in or about July 2021.

93. Hunter has been damaged by the unpaid Executive Producer compensation, in an amount to be determined at trial, plus interest. These damages are separate from the commissions and participation payments sought in other causes of action and are requested without duplicative recovery.

**SIXTH CAUSE OF ACTION**
(Unjust Enrichment, Pleaded in the Alternative)
(Against Debmar, Bernstein, and Marcus)

94. Hunter repeats paragraphs 1 through 66. This cause of action is pleaded in the alternative, to the extent no enforceable contract governs Debmar's payment to Hunter for the integration fees, revenue, and participation at issue.

95. Debmar was enriched. After April 18, 2019, it collected integration fees from brands Hunter brought to the Show, and it retained the participation share it had paid to Hunter every quarter for seven years.

96. The enrichment was at Hunter's expense. The fees came from integrations Hunter originated, and the participation share is the share Debmar had paid to Hunter himself. Debmar has paid Hunter nothing from either source for any period after April 18, 2019.

97. Hunter and Debmar dealt with each other directly. Debmar negotiated with Hunter, paid him for these same integrations and this same share every quarter for years, and knew that he expected payment.

98. Equity and good conscience require Debmar to restore to Hunter the benefit it has retained at his expense.

**SEVENTH CAUSE OF ACTION**
(Quantum Meruit, Pleaded in the Alternative)
(Against Debmar, Bernstein, and Marcus)

99. Hunter repeats paragraphs 1 through 66. This cause of action is pleaded in the alternative, to the extent no enforceable contract fixes Hunter's compensation for the services at issue.

100. Hunter performed services for Debmar in good faith. He identified brands, brought them to the Show, helped arrange their integrations, and co-produced on-air and in-field activations for several of them, as described in paragraph 36.

101. Debmar accepted those services. It ran the integrations Hunter brought on the Show and collected fees for them, including after April 18, 2019.

102. Hunter performed those services expecting to be paid for them, and Debmar knew it. Debmar paid him for the same kind of services every quarter for more than six years.

103. Debmar has not paid Hunter for the services that produced the fees it received after April 18, 2019. The reasonable value of those services is to be determined at trial. The commission and participation rates Debmar paid Hunter for the same services before April 2019 are evidence of that value.

**PRAYER FOR RELIEF**

WHEREFORE, Hunter requests that the Court enter judgment against Debmar, Bernstein, and Marcus, jointly and severally:

1. Awarding compensatory damages on the First through Fifth Causes of Action, including unpaid integration commissions, Hunter's unpaid share of the 15% integration participation, unpaid Executive Producer fees and compensation due under the parties' contractual arrangements, and damages resulting from Debmar's failure to accord the promised Executive Producer credit (including at least nominal damages on the Fourth Cause of Action), all in amounts to be determined at trial and without duplicative recovery;

2. In the alternative, awarding restitution on the Sixth Cause of Action and the reasonable value of Hunter's services on the Seventh Cause of Action;

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC
Case No. 1:22-cv-01687-PGG

# EXHIBIT 1

## November 5, 2007 Term Sheet

Wendy, Inc. and Debmar/Mercury LLC

# TERM SHEET

This binding term sheet (this "**Term Sheet**") is entered into as of November 5, 2007 between Wendy, Inc. ("**Lender**") for the services of Wendy Williams ("**WW**") and Debmar/Mercury LLC ("**DM**") and sets forth the basic terms and conditions of the parties' agreement with respect to WW's host services in connection with possible episodes of a proposed 1-hour television talk show series tentatively entitled "The Wendy Williams Show" hosted by WW (the "**Series**"). In consideration of the mutual promises set forth below, the parties agree as follows:

1. **Test**: DM has the right to engage Lender to cause WW to render host services for episodes of the Series for a test period of up to 18 months (as designated by DM in writing), which period will commence during the first 6 months of 2008 at such time, if any, as DM notifies Lender or WW in writing (the "**Test Period**"). DM has the right to produce as many or as few episodes of the Series during the Test Period as DM determines. It is contemplated that the Series, if produced, will be produced on a 5 episode per week basis.

2. **Test Fee**: Provided that neither Lender nor WW is in default hereof, for each week during the Test Period in which DM tapes episodes of the Series and WW renders and fully completes host services in connection with all such episodes, Lender is entitled to the following fees:

   a. $5,000/week during the first 6 months of the Test Period;

   b. $7,500/week during the second 6 months of the Test Period; and

   c. $11,000/week during the last 6 months of the Test Period.

3. **Options**: DM will have 5 consecutive options (each, an "**Option**") to engage Lender to cause WW to render host services during each of 5 production years. DM may exercise the first Option at any time prior to the expiration of the Test Period (subject to extension for Lender's or WW's default or WW's disability and for force majeure). DM may exercise any subsequent Option no later than 6 months after completion of taping of episodes during the then-current production year of the Series (subject to extension for Lender's or WW's default or WW's disability and for force majeure). During the Test Period, if DM produces episodes of the Series and broadcasts such episodes in markets covering more than 85% of the television households in the U.S., then DM will exercise the first Option (and, for the avoidance of doubt, the Test Period will end). A production year will be a period of 12 months from the commencement of production of episodes of the Series during such production year as designated by DM (exclusive of any episodes produced during the Test Period). DM has the right to produce as many or as few episodes of the Series during each production year as DM determines.

4. **Host Compensation**: For each Series production year that DM exercises an Option for Lender to provide WW's services hereunder, provided that neither Lender nor WW is in default hereof and WW renders and fully completes host services in connection with all episodes of the Series produced or scheduled to be produced during such production year hereunder, DM will pay Lender $1,250,000 (the "**Host Compensation**"), provided that the Host Compensation will increase by 5% (cumulatively) for each of the second and third production years of the Series and will increase by 10% (cumulatively) for each of the fourth and fifth production years of the Series (i.e., the Host Compensation will be $1,312,500 for the second production year, $1,378,125 for the third production year, $1,515,937.50 for the fourth production year, and $1,667,531.20 for the fifth production year). The Host Compensation will be payable over the course of production of the Series during each production year the manner that DM in its reasonable discretion determines. The Host Compensation is an advance against the Back-End. Notwithstanding the foregoing, if production of the Series is cancelled prior to the completion of production of 35 weeks of episodes of the Series during any production year the Host Compensation will be reduced pro rata.

5. **Back-End**: Provided that neither Lender nor WW is in default hereof, Lender will be entitled to an amount equal to 15% of the Net Proceeds (defined, computed and paid in accordance with DM's standard Net

Proceeds definition) in connection with all episodes of the Series for which WW renders and fully completes host services hereunder.

6. **First Negotiation/Last Refusal Rights**: If DM exercises all 5 Options, then if WW desires to render host services in connection with a talk show after the expiration of the exclusivity period, then DM will have customary rights of first negotiation and last refusal/matching right to engage WW to render host services in connection with additional episodes of the Series. If DM elects not to exercise any of the 5 Options and WW desires to render host services in connection with a talk show after the expiration of the exclusivity period pursuant to an agreement that is less favorable to WW than the agreement that WW would have with DM if DM exercised such Option, then DM will have a customary right of last refusal/matching right to engage WW to render host services in connection with additional episodes of the Series.

7. **Host Services**: Lender will cause WW to render, and WW will render, all services customarily rendered by talk show hosts of first class talk shows in the television industry in connection with the development, pre-production, production, post-production, and promotion of, and publicity with respect to, the Series and as otherwise required by DM. Lender will cause WW to render, and WW will render, host services as, when and where required by DM, and such services will be subject to DM's direction and control at all times.

8. **Exclusivity**:

a. During the Test Period, WW's services will be subject to WW's current on-air schedule (i.e., Monday through Friday, 2:00 pm EST to 7:00 pm EST) in connection with WW's radio show, "the Wendy Williams Experience" (the "Radio Show"), which DM will schedule around. WW's services will otherwise be first priority to the Series and exclusive in television (other than WW's special appearances on the Fox morning show, Entertainment Tonight and the Today Show [collectively, "Other Shows"], which special appearances DM will have the right to approve, such approval not to be unreasonably withheld). Without limiting the foregoing, WW acknowledges and agrees that DM's disapproval of WW rendering services in connection with the Other Shows is "reasonable" if DM's New York broadcast partner objects to WW rendering such services. In the event that the current on-air schedule of the Radio Show changes, DM will use commercially reasonable efforts to schedule WW's services around such changed schedule as long as the new schedule does not conflict with the airing of the Series in any market (which airing may be required to be day and date with taping).

b. After DM has exercised an Option, WW's services will be subject to WW's current on-air schedule in connection with the Radio Show (i.e., Monday through Friday, 2:00 pm EST to 7:00 pm EST), which DM will schedule around. WW will otherwise be exclusive to the Series in all media until the date that is 6 months after the initial broadcast of the last episode of the Series taped during the final production year of the Series. In the event that the current on-air schedule of the Radio Show changes, DM will use commercially reasonable efforts to schedule WW's services around such changed schedule as long as the new schedule does not conflict with the airing of the Series in any market (which airing may be required to be day and date with taping).

9. **Creative Control**: DM will have full creative control with respect to the Series, provided that DM will meaningfully consult with WW with respect to creative issues. For the avoidance of doubt, DM's decisions will control.

10. **Other Consultation Rights**: DM will meaningfully consult with WW with respect to the EP/show runner for the Series and employment decisions (i.e., hiring and firing decisions) with respect to the co-EP, booker and head writer of the Series, if any. For the avoidance of doubt, DM's decisions will control.

11. **Credit**: Provided that neither Lender nor WW is in default hereof, DM will accord WW the following credits:

a. A "Hosted by" credit on all episodes of the Series for which WW renders and fully completes host services.

b. An "Executive Producer" credit for WW and for Kevin Hunter on all episodes of the Series for which WW renders and fully completes host services.

Except as expressly set forth above, all matters regarding the credit to be accorded hereunder shall be determined by DM in its sole discretion. No casual or inadvertent failure by DM to comply with the credit provisions hereof (by reason of shortage of time or otherwise) nor any failure by any third party to comply with such credit provisions shall constitute a breach by DM of this Term Sheet; provided, however, that promptly following DM's actual receipt of written notice in reasonable detail from Lender or WW specifying any material failure by DM to comply with the credit provisions hereunder, DM agrees to use its commercially reasonable efforts to cure prospectively such failure to comply with respect to future prints and/or advertising, as applicable.

12. **Key Man**: DM will not have the right to exercise any particular Option hereunder if neither Mort Marcus nor Ira Bernstein is involved with the production or distribution of the Series at the time of such exercise ("**Key Man Requirement**"); provided, however, that the Key Man Requirement will not apply at any time commencing after the date that is 2 years after the initial broadcast of the first episode of the Series produced after the conclusion of the Test Period.

13. **Miscellaneous**:

a. All services rendered by WW will be rendered on a work-made-for-hire basis for DM, WW hereby waives all rights of droit morale, and Lender and WW assigns to DM all of the results and proceeds of WW's services hereunder. Lender and WW acknowledge and agree that DM or its designee will own all rights in and to the Series and all episodes thereof (and has the right to exploit such rights in perpetuity throughout the universe in all media now known or hereafter devised), DM or its designee will produce all episodes of the Series and DM or its designee will, subject to WW's consultation rights herein, make all decisions regarding the production and exploitation of the Series. Lender and WW acknowledge and agree that nothing herein obligates DM to use WW's services or the results and proceeds thereof in the Series (or any episodes thereof) or to develop, produce, advertise, distribute or otherwise exploit the Series (or any episodes thereof). Lender and WW will execute such further instruments and documents as DM reasonably requests to evidence, effectuate or confirm the provisions of this Term Sheet, and if Lender or WW fails to do so after reasonable notice, then Lender and WW hereby appoint DM as their attorney-in-fact for such purposes (it being acknowledged that such appointment is irrevocable and coupled with an interest) with full power of substitution and delegation. Lender and WW hereby grant DM the right to use and permit others to use WW's name, photograph, likeness, voice and biography and the results and proceeds of WW"s services hereunder in connection with the production, exhibition, advertising, publicity, promotion and other exploitation of the Series, and the exercise of subsidiary, allied and ancillary rights relating to the Series, in perpetuity throughout the universe in any and all media and means now known or hereafter devised. The compensation provided for herein is full and complete consideration for (and neither Lender nor WW will be entitled to further compensation for) all such rights and uses.

b. Lender and WW make customary representations and warranties (including, without limitation, that Lender and WW have right to grant the rights granted herein, neither Lender nor WW has or will enter into any commitment or agreement that conflicts in any way with Lender's or WW's obligations hereunder, and the results and proceeds of WW's services are wholly original with WW and will not violate or infringe any rights of any person or entities). Lender and WW will defend and indemnify DM for any third party claims arising out of Lender's or WW's breach or alleged breach of their representations, warranties and agreements in this Term Sheet. Excepting any matters arising out of Lender's or WW's breach or alleged breach of their representations, warranties and agreements of this Term Sheet and any matters arising out of Lender's or WW's negligence or

willful misconduct, DM will defend and indemnify Lender and WW for any third party claims arising out of development, production, distribution or other exploitation of the Series.

c. All of DM's payment obligations to Lender hereunder are subject to (i) DM's standard default (which will include breach of a customary morals provision), disability and force majeure provisions and (ii) such deductions and withholdings as may be required by any applicable law.

d. WW's services are special, unique, unusual, extraordinary, and of an intellectual character giving them a peculiar value, the loss of which cannot be reasonably or adequately compensated in damages in an action at law and DM, in the event of any breach by Lender or WW, will be entitled to equitable relief by injunction or otherwise. Lender's and WW's rights and remedies in the event of any breach by DM of the provisions of this Term Sheet will be limited to their right, if any, to recover damages in an action at law, and in no event will Lender or WW be entitled by reason of any such breach to terminate this agreement, or to enjoin or restrain the distribution or other exploitation of the Series, in whole or in part.

e. Lender acknowledges that Lender is being engaged on an independent contractor basis hereunder, and Lender agrees to make and assume full responsibility for, and to indemnify DM against, the payment of all taxes, penalties and other similar sums arising out of the foregoing compensation. Because DM has the right to control WW's services and WW is DM's "special employee" for purposes of all applicable workers' compensation laws, the rights and remedies of Lender and WW and/or their heirs, executors, administrators, successors, and assigns shall be governed by and limited to those provided under such workers' compensation statutes if WW should suffer or incur any injury, illness, disability or death arising out of or occurring in the course of WW's special employment pursuant to this Term Sheet.

f. WW's consultation rights herein are subject to WW being available as, when and where needed by DM.

g. DM may freely assign, delegate or otherwise transfer this Term Sheet and any of its rights or obligations herein (in whole or in part). Neither Lender nor WW may assign, delegate or otherwise transfer their rights or obligations under this agreement. Nothing contained herein will be deemed to constitute a joint venture or partnership between the parties.

h. Lender and WW will keep confidential all matters relating to this Term Sheet and the Series. All of DM's obligations hereunder will be subject to (i) WW's ability to prove her employment eligibility, including, without limitation, by completing, signing and delivering to DM a Form I-9 and (ii) WW's continued insurability. Lender and WW acknowledge and agree that the Series will be non-guild unless DM elects otherwise. This Term Sheet is governed by California law and is subject to the exclusive jurisdiction of the state and federal courts located in Los Angeles, California.

It is intended that a more formal agreement will be entered into by the parties hereto, incorporating the terms and conditions set forth herein and such other terms and DM's standard provisions for transactions of this nature (the "**Long Form Agreement**"). Until the Long Form Agreement is executed by the parties, or if for any reason it is not prepared or executed, this Term Sheet, along with DM's standard terms and conditions which are deemed incorporated herein by reference, will constitute a binding agreement between DM, on the one hand, and Lender and WW, on the other hand, and will supersede any and all prior communications with respect hereto and may not be modified except by a written instrument(s) signed by the parties.

The foregoing is agreed to and accepted as of the date first written above.

Very truly yours,

Debmar/Mercury, LLC

By: ____________________

Its: ____________________

ACCEPTED AND AGREED:

Wendy, Inc.

By: ____________________

Its: ____________________

I have read the foregoing Term Sheet and consent to the execution thereof and hereby join in, ratify and confirm all acknowledgments, representations, warranties, consents, and agreements of Wendy, Inc. ("Lender") contained therein. Without limiting the generality of the foregoing, I hereby confirm that Lender has the full right and authority to grant all rights granted in the foregoing letter agreement, and I hereby agree to be bound by all of the terms thereof and to render all services required of me pursuant thereto whether or not Lender performs its obligations under its employment contract with me and whether or not such contract remains in effect and whether or not Lender or its successors in interest should be dissolved, become insolvent or cease to exist or for any other reason whatsoever (including without limitation entering into any type of bankruptcy or similar proceeding) fail, be unable or refuse to perform and observe any or all of the conditions of the foregoing letter agreement requiring performance or compliance on its part. I further agree to look solely to Lender for any and all compensation to which I may be entitled by reason of the foregoing letter agreement or any services rendered by me pursuant thereto. Finally, I hereby guarantee full performance by Lender of all terms of the foregoing letter agreement and agree that under said letter agreement, Debmar/Mercury, LLC may proceed directly against me, in the event of any breach or default under said Term Sheet, as though I were a direct party thereto.

____________________

Wendy Williams

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC
Case No. 1:22-cv-01687-PGG

# EXHIBIT 2

## December 20, 2011 Email

Mort Marcus offer forwarded by Pam Smith

# FW: Offer

From: Pam Smith (psmith@wendyshow.com)

To: questionmarkenter@yahoo.com

Date: Tuesday, December 20, 2011, 6:49 PM EST

------ Forwarded Message
**From:** Mort Marcus <mort@debmarmercury.com>
**Date:** Tue, 20 Dec 2011 18:45:18 -0500
**To:** Pam Smith <PSmith@WendyShow.com>, Ira Bernstein-AOL <irabern@aol.com>
**Subject:** RE: Offer

Pam
The below is what was discussed with Kevin. Pam please let them know that both Ira and I are gone till the first of January.. and our offices are closed till then as well..

$150k Now –
Then starting this fall 2012… $1,516(this is current contract amount) Kevin goes to 200k
then season5 Wendy goes to $1.8 (current contract is for 1.667) and we will take Kevin to 225k
season6 Wendy goes to 2.0 Kevin to 250,
season7 Wendy goes to 2.4 Kevin to 275,
season8 Wendy goes to 2.7 Kevin to 300
so by year 8 Wendy/Kevin would be at 3M combined $2.7/.3

**From:** Pam Smith [mailto:psmith@wendyshow.com]
**Sent:** Tuesday, December 20, 2011 9:38 AM
**To:** Mort Marcus; Ira Bernstein-AOL
**Subject:** Offer
**Importance:** High

Good Day,

As per Kevin please resend the numbers you presented, they would like to review and also discuss a counter offer to what you proposed.

Thank you,
Pamela Smith on behalf of
Kevin Hunter

------ End of Forwarded Message

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC
Case No. 1:22-cv-01687-PGG

# EXHIBIT 3

## November 16, 2016 Anderson Correspondence

Jacqueline Anderson quoting Matt Uzzle, as reproduced in Hunter's reply

On Wed, Nov 16, 2016 at 3:38 PM, Jacqueline Anderson<JAnderson@wendyshow.com> wrote: Hi Abbey & Lori,
Attached is what I received from our Executive In Charge of Production, Matt Uzzle. It is an A/P report detailing the last two payments to Kevin's company. Regarding Kevin, Matt said:"He's not on payroll. He's paid via accounts payable through his Inc. 53rd Mgmt Inc is a corporate entity therefore there is no W2 or 1099."
Kevin also informed me he was not including any documents regarding Wendy. I hope the attachment helps.
Thanks!JSA

Jacqueline AndersonExecutive Assistant To Talent & Executive Producer
226 West 26th St., 4th Fl., New York, NY 10001
O: 212.401.6170 | C: 310.740.2474 | F: 646.417.7003janderson@wendyshow.com

| | |
|---|---|
| **UID:** | 137052 |
| **Message ID:** | <2006997709.1281370.1479330554740@mail.yahoo.com> |
| **Thread ID:** | 22356c291fa2edc0222a1528b7ecae0423a0625ba7ec1c9d735e18100a67f893 |
| **Thread method:** | reply-header relationship (not independently verified) |
| **Thread size:** | 1 |
| **Direction:** | Outgoing |
| **Date:** | 2016-11-16T21:09:14+00:00 |
| **Received date:** | 2016-11-16T21:09:14+00:00 |
| **Sender:** | Kevin Hunter <questionmarkenter@yahoo.com> |
| **To:** | Jacqueline Anderson <JAnderson@wendyshow.com> |
| **Cc:** | |
| **Bcc:** | |
| **Reply to:** | "questionmarkenter@yahoo.com" <questionmarkenter@yahoo.com> |
| **Subject:** | Re: Paystubs |
| **Folder:** | Sent |
| **In reply to:** | <D4522C24.10684%janderson@wendyshow.com> |
| **References:** | <BN3PR0601MB1284FD903898EA7AFE5AD4DA94BE0@BN3PR0601MB1284.namprd06.prod.outlook.com> <D4522C24.10684%janderson@wendyshow.com> |
| **Flags:** | \Seen $NotJunk |
| **Raw headers:** | Date: Wed, 16 Nov 2016 21:09:14 +0000 (UTC)<br>From: Kevin Hunter <questionmarkenter@yahoo.com><br>Reply-To: "questionmarkenter@yahoo.com" <questionmarkenter@yahoo.com><br>To: Jacqueline Anderson <JAnderson@wendyshow.com><br>Message-ID: <2006997709.1281370.1479330554740@mail.yahoo.com><br>In-Reply-To: <D4522C24.10684%janderson@wendyshow.com><br>References:<br><BN3PR0601MB1284FD903898EA7AFE5AD4DA94BE0@BN3PR0601MB1284.namprd06.prod.outlook.com> <D4522C24.10684%janderson@wendyshow.com><br>Subject: Re: Paystubs<br>MIME-Version: 1.0<br>Content-Type: multipart/alternative;<br>boundary="----=_Part_1281369_792697794.1479330554736"<br>Content-Length: 13512 |
| **Routing-header IP addresses:** | |
| **Authentication results:** | |
| **Return path:** | |
| **DKIM signature:** | |
| **Original EML SHA-256:** | effe7533aeb7605b2ad55932990e5dd2c17638f1017fdf899db854bed530f589 |
| **Original EML file:** | originals/000470_uid-137052_effe7533aeb7605b.eml |
| **UID validity:** | 2 |
| **RFC822 size (bytes):** | 14520 |
| **Fetched at:** | 2026-11-11T18:56:43.745071+00:00 |
| **Attachments:** | |
| **Body:** | need 3 checkstubs |

Sent from Yahoo Mail on Android

On Wed, Nov 16, 2016 at 3:38 PM, Jacqueline Anderson<JAnderson@wendyshow.com> wrote: Hi Abbey & Lori,

Attached is what I received from our Executive In Charge of Production, Matt Uzzle. It is an A/P report detailing the last two payments to Kevin's company. Regarding Kevin, Matt said:"He's not on payroll. He's paid via accounts payable through his Inc. 53rd Mgmt Inc is a corporate entity therefore there is no W2 or 1099."

Kevin also informed me he was not including any documents regarding Wendy. I hope the attachment helps.

Thanks!JSA

Jacqueline AndersonExecutive Assistant To Talent & Executive Producer
226 West 26th St., 4th Fl., New York, NY 10001
O: 212.401.6170 | C: 310.740.2474 | F: 646.417.7003janderson@wendyshow.com

From: Abbey Wolecki <awolecki@spl-cpa.com>
Date: Wednesday, November 16, 2016 at 9:18 AM
To: Jacqueline Anderson <janderson@wendyshow.com>
Subject: Paystubs

<!-- _filtered {font-family:Calibri;panose-1:2 15 5 2 2 2 4 3 2 4;} p.MsoNormal, li.MsoNormal, div.MsoNormal {margin:0in;margin-bottom:.0001pt;font-size:11.0pt;font-family:"Calibri", "sans-serif";}a:link, span.MsoHyperlink {color:blue;text-decoration:underline;}a:visited, span.MsoHyperlinkFollowed {color:purple;text-decoration:underline;}span.EmailStyle17 {font-family:"Calibri", "sans-serif";color:#1F497D;}.MsoChpDefault {font-family:"Calibri", "sans-serif";} _filtered {margin:1.0in 1.0in 1.0in 1.0in;}div.WordSection1 {}-->
Hi Jacqueline,

Can you please help me obtain the following items for Lori Schiller (the investment advisor):

1- 2014 Wendy Inc W-2 for Wendy

2-2 of the most recent pay stubs for Wendy from Wendy Inc?

3- 53rd West Management W-2 for 2014 for Kevin

Thanks,

Abbey Wolecki

Sacks,Press & Lacher

600 Third Avenue - 18th FL

New York, NY 10016

T:212-682-6640 ext 143

F:212-557-8415

To ensure compliance with requirements imposed by the IRS, we inform you that unless specifically indicated otherwise, any tax advice contained in this communication (including any attachment to this communication, other than an attachment which is a formal tax opinion) was not intended or written to be used, and cannot be used, for the purpose of (i) avoiding tax-related penalties under the Internal Revenue Code, or (ii) promoting, marketing, or recommending to another party any tax-related matter addressed herein.

CONFIDENTIAL!

This electronic message and any attachments to it may contain information that is legally confidential. This information is intended only for the individual or entity named above and is not to be disclosed or distributed any further. Access by any other party is prohibited. If you are not the intended recipient any disclosure, copying, distribution or use of the contents of

received any of this information in error, please notify the sender immediately and delete or destroy this message and/or attachments.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC

Case No. 1:22-cv-01687-PGG

# EXHIBIT 4

## October 22, 2012 Commission Email

Kevin Hunter to Karrie Komaru

EMAIL ARCHIVE | READING COPY

## Message 155

From: Kevin Hunter <questionmarkenter@yahoo.com>
To: "karrie@debmarmercury.com" <karrie@debmarmercury.com>
Cc: "liz@debmarmercury.com" <liz@debmarmercury.com>, "sweetshells15@yahoo.com" <sweetshells15@yahoo.com>, "jillr@wendy-inc.com" <jillr@wendy-inc.com>
Date: 2012-10-22T08:46:09-07:00
Received: 2012-10-22T15:46:09+00:00
Subject: Kevin Hunter/DebMar Mercury Commission
Direction: Outgoing

**Message text**

Hi Karrie-

Please let this serve as notice that my agreement with DebMar Mercury in connection with integrations that I bring to The Wendy Williams Show is the following:

- 53rd West Management, Inc. will received a 10% commission on all integrations brought by

Kevin Hunter, minus net costs.

Please do not hesitate to contact me with any questions and/or concerns.

Best,

Kevin Hunter

End of message 155

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC
Case No. 1:22-cv-01687-PGG

# EXHIBIT 5

## October 22-24, 2012 Commission Emails

Correspondence between Kevin Hunter and Karrie Komaru

---

**From:** Karrie Komaru <Karrie@debmarmercury.com>;
**To:** Kevin Hunter <questionmarkenter@yahoo.com>;
**Cc:** Liz Koman <Liz@debmarmercury.com>; sweetshells15@yahoo.com < sweetshells15@yahoo.com >; jillr@wendy-inc.com < jillr@wendy-inc.com >;
**Subject:** RE: Kevin Hunter /DebMar Mercury Commission
**Sent:** Mon, Oct 22, 2012 10:20:51 PM

Hi Kevin,

Thank you for the information.

Payment for the commission due has been submitted for processing and scheduled for the next few days.

I will let you know when the payment is sent.

Thanks,

**Karrie Komaru**

**Controller**

**Debmar Mercury LLC**

**(310) 393-6330**

**(310) 393-6110 Fax**

**karrie@debmarmercury.com**

# RE: RE: Kevin Hunter/DebMar Mercury Commission

From: Karrie Komaru (karrie@debmarmercury.com)

To: questionmarkenter@yahoo.com

Date: Wednesday, October 24, 2012, 6:17 PM EDT

---

FYI…the commission check was sent today, by Fed Ex.

It is addressed to you and sent to the Wendy Williams Studio. You should receive it tomorrow.

**Karrie Komaru**

**Controller**

**Debmar Mercury LLC**

**(310) 393-6330**

**(310) 393-6110 Fax**

karrie@debmarmercury.com

---

**From:** Kevin Hunter [mailto:questionmarkenter@yahoo.com]
**Sent:** Monday, October 22, 2012 3:56 PM
**To:** Karrie Komaru
**Subject:** Re: RE: Kevin Hunter /DebMar Mercury Commission

Cool....thx

Sent from Yahoo! Mail on Android

---

**From:** Karrie Komaru <Karrie@debmarmercury.com>;
**To:** Kevin Hunter <questionmarkenter@yahoo.com>;
**Cc:** Liz Koman <Liz@debmarmercury.com>; sweetshells15@yahoo.com < sweetshells15@yahoo.com >; jillr@wendy-inc.com < jillr@wendy-inc.com >;
**Subject:** RE: Kevin Hunter /DebMar Mercury Commission
**Sent:** Mon, Oct 22, 2012 10:20:51 PM

Hi Kevin,

Thank you for the information.

Payment for the commission due has been submitted for processing and scheduled for the next few days.

I will let you know when the payment is sent.

Thanks,

**Karrie Komaru**

**Controller**

**Debmar Mercury LLC**

**(310) 393-6330**

**(310) 393-6110 Fax**

**karrie@debmarmercury.com**

---

**From:** Kevin Hunter [mailto:questionmarkenter@yahoo.com]
**Sent:** Monday, October 22, 2012 8:46 AM
**To:** Karrie Komaru
**Cc:** Liz Koman ; sweetshells15@yahoo.com ; jillr@wendy-inc.com
**Subject:** Kevin Hunter /DebMar Mercury Commission

Hi Karrie-

Please let this serve as notice that my agreement with DebMar Mercury in connection with integrations that I bring to The Wendy Williams Show is the following:

- 53rd West Management, Inc. will received a 10% commission on all integrations brought by Kevin Hunter , minus net costs.

Best,

Kevin Hunter

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC

Case No. 1:22-cv-01687-PGG

# EXHIBIT 6

## January 9, 2012 Memorandum

Wendy, Inc. to Mort Marcus and Ira Bernstein

**WENDY, INC.**

To: Mort Marcus & Ira Bernstein
From: Kevin Hunter
CC: Wendy Hunter
Date: January 9, 2012
Re: Negotiation of Wendy Williams Contract Terms w/DebMar Mercury

---

Dear Mort and Ira:

Below please find our proposed deal terms with respect to entering into a new agreement with DebMar Mercury. Upon review, please contact me to discuss.

1. **Term**- 2 remaining contract years (Years 4-5), with 2 additional contract years (Years 6-7).

2. **Fees**-

Signing Bonus- $200k, to be paid immediately.

Year 4 - $2.0mil w/additional $350k to be paid Jan. 1, 2013- (1,515,937.50)- THIS NUMBER IS THE ORIGINAL CONTRACT FEE.
Year 5- $3.0mil - (1,800,000 up from $1,667,531.20)-
Year 6- $3.5mil- (2,100,000)
Year 7- $4.0mil- (2,400,000)

Bonus Structure

1.5 Share $250k
1.7 Share $500k
2.0 Share $850k

THE ABOVE BONUS STRUCTRUE IS OUT. If the show get a consistent, 1.4, the total compensation will be as follows:

Year 4- 2,350,000
Year 5- 3,000,000
Year 6- 3,500,000
Year 7- 4,000,000

3. **Back-End Participation** - The formula should be changed from the current "net" to a MAGR (modified adjusted gross receipts) backend, the definition of which will be fully negotiated. The increased backend should apply to the upcoming year as well as the new term.

They agreed to switch to MAGR but the distribution fees should be reduced as follows:

ALL DISTRIBUTION FEES SHALL BE REDUCED BY 10% however, merchandising should be reduced from 40% to 25%.

4. **Ancillary Income-** WW should receive 15% of product integration fees and ancillary exploitation from the series, including but not limited to merchandising and music income.

WE AGREED TO THIS.

5. **Exclusivity**- Wendy Williams should be exclusive in network television only. All other activities should be in WW's control and reserved to her, subject only to her talk show obligations. The reserved rights should include social networking, radio, film, cable, etc.

THEY ONLY WANT TO GIVE US FILM but we want CABLE and RADIO as well.

6. **Credit**- WW should have a production company credit added to the current credits..

We agreed to this.

7. **Creative Control**- WW should have mutual approval of the showrunner and other key elements of the show.

We agreed but they have the final say.

8. **Miscellaneous**- There should be cooperation and tie-in to other WW activities, such as live appearances, including QVC.

There is no mention of this but the idea is that you have a certain "bank" for mentions as in the one we created at WBLS.

OTHER POINTS:

A: Security in case the series is cancelled before the end of the season.
B. First Negotiation/Last Refusal Rights- We agreed to this ONLY if DebMar exercises all of its options.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Kelvin Hunter v. Debmar-Mercury LLC
Case No. 1:22-cv-01687-PGG

# EXHIBIT 7

## Debmar-Mercury Termination Notice

Ira Bernstein and Mort Marcus to Kelvin Hunter

DEBMAR-MERCURY

**VIA TELEPHONE AND HAND DELIVERY:**

Mr. Kelvin Hunter
11 Thames Drive
Livingston, New Jersey 07039

Dear Kevin:

Out of respect for our 10-year working relationship, we had hoped to meet with you in person and traveled to New York to do so, but unfortunately, you have cancelled today's meeting and we are left with no choice but to communicate to you in writing that effective immediately, your role as an Executive Producer of the Wendy Williams Show is terminated, and your professional relationship with Debmar-Mercury is also concluded.

In connection with the termination of your employment, you are no longer permitted on the studio premises and all communication regarding your transition (including collection of your belongings from the studio premises) should be handled via your attorney as you have indicated that you are represented by counsel. Your attorney may reach out to either of us directly so we can direct him/her to the appropriate parties.

Thank you for all of your contributions over the years, Kevin. We wish you well.

Ira Bernstein & Mort Marcus
Co-Presidents, Debmar-Mercury

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Kelvin Hunter v. Debmar-Mercury LLC**
Case No. 1:22-cv-01687-PGG

# EXHIBIT 8

## November 16, 2016 A/P Vendor Analysis

Debmar payments to 53rd West Management Inc. (EP fees)

Detailed Report
Date Range: 09/03/16 to 11/16/16
Vendor numbered 000518

Production: 2009 THE WENDY WILLIAMS SHOW
Company: 001 THE WENDY WILLIAMS SERIES
(All banks)
(All states)
Including: Paid items.
Excluding: Unposted, Open and Voided items.

Vendor: 000518 53RD WEST MANAGEMENT INC.

| Ref # | Status | Bank | Cur | Check # | Chk Date | Invoice # | Description | Acct | Ser | Loc | Set | FF1 | FF2 | FF3 | Amount | Eff Date | 1099 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50068 | Paid | BA1 | US | 017577 | 10/01/16 | 100116 | EP FEES-OCTOBER 2016 | | | | | | | | 33,333.33 | 09/28/16 | |
| | | | | | | | A/P offset | 2001 | | | | | | | (33,333.33) | 09/28/16 | |
| | | | | | | | EP FEES-OCTOBER 2016 | 6001 | 8000 | NY | 1 | | | | 33,333.33 | 09/28/16 | |

| Ref # | Status | Bank | Cur | Check # | Chk Date | Invoice # | Description | Acct | Ser | Loc | Set | FF1 | FF2 | FF3 | Amount | Eff Date | 1099 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 50692 | Paid | BA1 | US | 017761 | 10/26/16 | 110116 | EP FEE-NOVEMBER 2016 | | | | | | | | 33,333.33 | 10/26/16 | |
| | | | | | | | A/P offset | 2001 | | | | | | | (33,333.33) | 10/26/16 | |
| | | | | | | | EP FEE-NOVEMBER 2016 | 6001 | 8000 | NY | 1 | | | | 33,333.33 | 10/26/16 | |

Total for vendor: 000518 53RD WEST MANAGEMENT INC. 66,666.66

End of A/P Vendor Analysis by Number

3. Directing Debmar to account for integration fees received after April 18, 2019 on integrations Hunter brought and on integrations subject to the 15% participation, and for Executive Producer compensation paid, accrued, withheld, or otherwise recorded for Hunter, to the extent such relief is available;

4. Awarding prejudgment interest at the New York statutory rate under N.Y. C.P.L.R. 5001 and 5004, and postjudgment interest;

5. Awarding costs; and

6. Granting such other and further relief as the Court finds just and proper.

**JURY DEMAND**

Hunter demands a trial by jury on all issues so triable.

Dated: Coral Springs, Florida
November 16, 2026

Respectfully submitted,

/s/ Kelvin Hunter

Kelvin Hunter
Plaintiff, Pro Se
1440 Coral Ridge Drive #223
Coral Springs, Florida 33071
Telephone: 646-763-0834
Email: hkinc917@gmail.com

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| **Exhibit 1** | Term Sheet between Debmar/Mercury, LLC and Wendy, Inc., dated November 5, 2007 |
| **Exhibit 2** | Email from Mort Marcus forwarded by Pam Smith, December 20, 2011 |
| **Exhibit 3** | Email from Jacqueline Anderson quoting Matt Uzzle, November 16, 2016 |
| **Exhibit 4** | Email from Kevin Hunter and Karrie Komaru (Debmar Controller), October 22 to 24, 2012 |
| **Exhibit 5** | Emails between Kevin Hunter and Karrie Komaru (Debmar Controller), October 22 to 24, 2012 |
| **Exhibit 6** | Wendy, Inc. memorandum to Mort Marcus and Ira Bernstein, January 9, 2012 |
| **Exhibit 7** | Notice from Ira Bernstein and Mort Marcus to Kevin Hunter, April 18, 2019 |
| **Exhibit 8** | A/P Vendor Analysis by Number, The Wendy Williams Series, November 16, 2016 (53rd West Management, Inc.) |